Earl J. BROWN, Robert A. Lehman, John O. Bodman, A. C. Commander, James B. Mills, C. Alton Brown, M. Stanley Lee, James A. Holmboe, E. Lynn Nichols, Petitioners,

v.

The BANKING BOARD of the State of Oklahoma, comprised of John D. Williams, Chairman, and State Bank Commissioner, Howard G. Barnett, Jack E. Black, Neil D. Dykeman and Maurice Lampe, Members, and May Avenue Bank & Trust Company, Oklahoma City, Founders National Bank, Oklahoma City, Community National Bank, Warr Acres, First National Bank of Bethany, Bethany and Penn Square National Bank, Oklahoma City, Respondents.

STATE of Oklahoma ex rel. Earl J. BROWN, Robert A. Lehman, John O. Bodman, A. C. Commander, James B. Mills, C. Alton Brown, M. Stanley Lee, James A. Holmboe, and E. Lynn Nichols, Petitioners,

v.

The BANKING BOARD of the State of Oklahoma, and A. E. Leonard, Bank Commissioner, Respondent,

C. W. Smith, Jerry Black, James Meade, Jack Schwab, William C. Brown, Don W. Fitzgerald, John Conard, and Paul Hudiburg, Intervenors.

LAKESHORE NATIONAL BANK (proposed), Appellants,

v.

The BANKING BOARD of the State of Oklahoma, Appellee.

In re Application for Charter for FIRST HEFNER BANK, May Avenue Bank and Trust Company, et al., Protestants-Appellant,

v.

The STATE BANKING BOARD of the State of Oklahoma, and C. W. Smith, et al., Appellees.

Nos. 48117, 48930, 49837 and 49838.

Supreme Court of Oklahoma.

May 23, 1978.

.

Robert S. Baker, of Pierce, Duncan, Couch & Hendrickson, Oklahoma City, for petitioner.

Keith McMillin, William G. Paul, Oklahoma City, for respondents in No. 48117.

Larry Derryberry, Atty. Gen., for respondent in No. 48930.

Jerry R. Nichols, of Kothe, Nichols & Wolfe, Inc., Tulsa, for intervenors.

Hastie, Kirschner & Brown, Oklahoma City, for appellants.

Jerry R. Nichols, of Kothe, Nichols & Wolfe, Inc., Tulsa, for appellees in No. 49837.

William G. Paul, Oklahoma City, for protestants-appellants.

Jerry R. Nichols, of Kothe, Nichols & Wolfe, Inc., Tulsa, for appellees in No. 49838.

SIMMS, Justice.

These four actions pending before this Court have a common theme: each of three proposed banks (Wilshire, First Hefner, and Lakeshore National) seeks to be the only bank chartered in the same northwest Oklahoma City trade area.

Therefore, although the parties are not identical and the cases are before us on certiorari, as well as by prayer for extraordinary relief, we consolidate them for final determination of the related issues. *Vose v. Banking Board*, Okl., 483 P.2d 731 (1971). Consolidation is additionally necessary because this is the second occasion that the controversy between the proposed Wilshire and First Hefner banks has been before this Court. See: *Brown v. Banking Board*, Okl., 512 P.2d 166 (1973).

The following chronological recitation of events concerning the various phases of this intertwined litigation is essential to understanding and resolving the complex issues presented.

Earl J. Brown, and other individuals initially filed an application for the chartering of a state bank to be located near the intersection of Wilshire and MacArthur Boulevards in Oklahoma City, and known as the Wilshire Bank (Wilshire). The Banking Board denied the charter to Brown and his co-applicants in 1970 and the order was affirmed by the Court of Bank Review. This Court granted certiorari, vacated the order denying the Wilshire charter and remanded the matter with instructions to make and separately state specific findings of fact and conclusions of law in support of any order granting or denying the requested bank. See: *Brown, supra.*

Thereafter, on July 17, 1973, pursuant to our decision in *Brown*, the Wilshire applicants sought permission of the Banking Board for an opportunity to present additional evidence in support of their charter application. The purpose of this request was clear; it was to:

"[S]imply update the evidence submitted three years ago, as opposed to proposing new theories or different areas of consideration. [For] the Board should receive such current evidence, it would then be in a position to issue a current order supported by current findings and conclusions which would meet the requirements of the [*Brown*] opinion and serve the public need and advantage. Such an or-

der supported by current findings and conclusions would likewise speak to the 1973 conditions in the community in contradistinction to the conditions in 1970."

Notwithstanding the vacation of the prior Banking Board order by this Court, George T. Frame, Acting Bank Commissioner, on July 23, 1973, notified the attorney for the Wilshire applicants by letter that no new or additional evidence would be received by the Banking Board. Following receipt of the Frame letter, counsel for Wilshire submitted proposed findings of fact and conclusions of law which were rejected by the Banking Board.

No public hearing was held, Wilshire's application was again denied and they again appealed to the Court of Bank Review which, for the second time, affirmed the Board's denial. Wilshire seeks certiorari (48,117).

In 1975, while Wilshire's petition for certiorari was pending before this Court, C. W. Smith and others filed an application for charter with the Banking Board for a state bank, to be known as First Hefner Bank (Hefner) located at the northwest corner of the intersection of Northwest Highway and MacArthur in Oklahoma City, approximately 100 yards from the proposed Wilshire Bank location. For all practical purposes the intersections of MacArthur and Northwest Highway, and MacArthur and Wilshire are one and the same, as Wilshire "dead-ends" into MacArthur approximately one block north of Northwest Highway and MacArthur. The Banking Board granted Hefner's charter and the Court of Bank Review affirmed the order. Wilshire, as petitioner, seeks prohibition in this Court to prevent the Hefner charter from issuing until final determination on appeal is made of Wilshire's second denial (48,930).

While Wilshire's actions protesting the denial of its application and the granting of Hefner's charter were pending in this Court, a group of unnamed persons, acting through James Roy Smith, sought a National Bank charter through the Comptroller of the Currency of the United States. This National Bank was to be located at the intersection of Northwest Highway and 63rd Street, approximately one and one-fourth miles southeast of both Wilshire and Hefner, and known as Lakeshore National Bank (Lakeshore). On March 25, 1976, the Comptroller advised all interested parties that Lakeshore's charter was approved. This application was granted notwithstanding the facts that the State Banking Board had previously granted a charter to Hefner, and that Wilshire's petition for certiorari and extraordinary relief were pending in this Court; and also notwithstanding the evidentiary assertion that the charters of Lakeshore and Hefner overlapped the same trade area. It was also argued by a protestant, the Lakeshore charter would be a "monopolistic concentration of power" by large city banks, because Mr. Smith had been associated with the First National Bank & Trust Company of Oklahoma City for some time and two of the organizers of Lakeshore were officers of First National.

Lakeshore, although granted a charter for a National Bank, seeks through certiorari to reverse the granting of Hefner's charter (48,837). This action is consolidated with certiorari sought by various adjacent suburban banks that objected to the applications of both Wilshire and Hefner and now seek to reverse the granting of Hefner's charter (48,838).

All parties to this litigation agree that this defined trade area in the Northwest part of Oklahoma City is the most rapidly growing area in the metropolitan expanse in both residential and commercial development. The Wilshire/Hefner trade area has a present population of 34,000 plus and it is expected to reach 66,000 in 1985. There are approximately 393 businesses in the proposed state bank trade area, and the average yearly income per family is approximately $20,000.

## I.

We begin with the lengthy controversy between Wilshire and Hefner. Wilshire's contentions can be summarized as follows: (1) That the evidence presented in 1970

clearly and convincingly showed that there was a public need and advantage for the proposed bank and that it held reasonable promise of successful operation; (2) That the Banking Board ignored this Court's mandate in *Brown I* by failing again in its 1973 denial, to make specific findings of fact and conclusions of law, and that the Court of Bank Review merely rubber stamped the Board's 1973 ratification of its 1970 order; (3) That the Board's refusal to receive and consider the current evidence in 1973 was error which requires reversal; and (4) That the granting of Hefner's application by the Banking Board and affirmed by the Court of Bank Review must be held in abeyance until Wilshire's appeal of its denial is determined.

The Banking Board order which originally denied Wilshire's charter application in 1970 was couched in the precise language of the statute, i. e., 6 O.S.Supp.1968, § 306, F: "that the public need and advantage will not be promoted by the establishment of the proposed bank or trust company [Wilshire] and (2) the conditions in the community in which the bank or trust company would transact business do not afford reasonable promise of successful operation." No findings of fact nor conclusions of law were contained in the first order of denial to Wilshire, and this Court vacated the order and remanded the matter to the Banking Board with directions to make specific findings of fact and conclusions of law as the basis of any order "granting or denying" Wilshire's charter: See, *Brown v. Banking Board, supra.*

Pursuant to our mandate in *Brown I*, Wilshire requested that the Board simply permit them to update the evidence they had submitted three years earlier so that the Board would be in a position to enter a *current* order based on *current* conditions. The request set forth specific economic data to be considered as additional evidence and specified the record Wilshire desired to supplement in support of the application. In the alternative, Wilshire requested that the Board at least consider its own public records in its office. Wilshire contended that the facts existing in 1973 showed the undis-

putable validity of their 1970 prognostications of the population and economic growth of the trade area.

In *Brown I* we established three legal precedents which are important in resolving the matter of Brown II now before us:

(1) The Banking Board of Oklahoma is governed by the provisions of the Administrative Procedures Act, 75 O.S.1971, § 301, et seq., when that Act is not in express conflict with the provisions of Oklahoma's Banking Code, 6 O.S.1971, § 101, et seq.,

(2) An absence of findings of fact to support statutory conclusions of law is fatal to a decree of the Banking Board; and

(3) That in determining whether there is substantial evidence in the record to support the Banking Board's order, the reviewing court shall look to the entire record and take into account not only that evidence which supports the Board, but also that evidence contradictory to the view of the Board. (Modifying *Village Bank v. Seikel*, Okl., 503 P.2d 550 (1972).

Based upon *Brown I*, we must address these questions: Did the Banking Board's refusal to permit Wilshire to adduce additional evidence supportive of their application violate the provisions of either the Administrative Procedures Act or Banking Code by which it is governed? And, second, was Wilshire deprived of a fundamental right when denied an opportunity to present additional evidence in support of their application after remand, particularly in light of the allegations that in the three year period there had been substantial changes in the population and economic and business conditions in the proposed trade area to be serviced by Wilshire which indicated an even greater demand for the bank.

Although 6 O.S.1971, § 207(C) vests the Court of Bank Review with the authority to affirm or direct such action by the Board as may be affirmatively required by law, or to reverse or modify the order of the Board or Commissioner upon certain specified grounds, and § 207(D) provides for review

by certiorari of an order of the Court of Bank Review in the Supreme Court, the Banking Code is silent as to the course of action to be taken by the Banking Board upon an order of remand.

We must then look to the Administrative Procedures Act for guidance in determining the issue. The capacity and duty of an administrative agency to receive and consider new evidence under proper circumstances are clear.

Title 75, O.S.1971, § 317, provides numerous grounds for reopening or reconsideration of a matter by an agency within 10 days of the entry of an order and, pursuant to 75 O.S.1971, § 322(1)(g), (2), a cause may be remanded to the agency for taking and considering further evidence. These provisions of course support our holding in *Corporation Comm. v. Oklahoma State Personnel Board,* Okl., 513 P.2d 116 (1973), that the important point in a proceeding before an administrative board is that each party be accorded a full and fair hearing on all the points at issue.

By way of analogy, the power and duty of the State Industrial Commission to reopen proceedings upon vacation of its orders and remand by the Court is well settled. As in banking actions, Industrial Court cases are also not reviewed by regular appellate procedures.

In *Boen v. State Ind. Comm.,* Okl., 212 P.2d 457 (1949), we held that:

"Where an award is vacated by the Supreme Court for further proceedings, the State Industrial Commission has the power to, and should, re-open the cause and allow the parties to present any evidence that will assist in determining the issues in the case."

In *Adams v. City of Anadarko,* 202 Okl. 72, 210 P.2d 151, 152 (1949), it was stated that:

"Therefore, when this Court vacated that order [an order of the Industrial Commission] and remanded the cause for further proceedings the case stood as though no order or award had ever been made in the case. The Commission then had authority upon receipt of the mandate to proceed to try the case anew."

In *Yeargin v. Gaar-Wooley Oil Co.,* Okl., 395 P.2d 564 (1964), this Court adhered to the rule promulgated in *Adams, supra.* Accord: *Darby v. Boehnlein,* Okl., 354 P.2d 446 (1960); *Dixon Brothers Lumber and Supply Co. v. Watson,* Okl., 353 P.2d 478 (1960).

Oklahoma is not alone in its commitment to the rule that on remand to an agency, a party is entitled to adduce evidence showing a change in conditions which might directly affect judgment. In *Southern Pacific Company v. Corporation Commission,* Ariz., 83 Ariz. 333, 321 P.2d 224 (1958), the Arizona Supreme Court held that when a prior order of the Arizona Corporation Commission had been vacated, the matter remained pending before the Commission as though no order had been made. The Arizona Court observed that the Commission apparently believed the only legal action it could take was to enter a second order made upon a record made three years previously without considering anything that might have happened in the interim. The Court held it was error to deny a hearing on changed conditions and that "Due Process of law demands" a hearing after remand where there is an apparent change in conditions.

This fundamental legal theorum has also been adopted by the Supreme Court of the United States. In *Atchison, T. & S. F. Ry. Co. v. United States,* 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932), that Court, speaking through Mr. Chief Justice Hughes, held that the Interstate Commerce Commission's denial of a second petition for rehearing in the nature of a supplemental bill requesting reopening and reconsideration of rate structures because of changed economic conditions was improper. The United States Supreme Court held that not only is a fair hearing a fundamental requirement, but that where there has been a change of conditions, and a hearing which would relate to present conditions is suitably requested, the denial of the hearing *is the denial of a right.*

Obviously, nothing in our mandate in *Brown I* precluded the Board from hearing

additional evidence tending to establish the current economic status of the proposed trade area of the Wilshire Bank; or receiving additional evidence upon the issues of service of the public interest and potential for success of Wilshire.

■ We conclude that Wilshire's request for an opportunity to update its evidence following remand was reasonable and proper, and that the Board's denial of this request was a fatal deprivation of the legal rights of the Wilshire applicants.

■ In addition to refusing Wilshire an opportunity to update its evidence, the Banking Board merely "ratified, approved and confirmed" its prior denial and rendered findings of fact and conclusions of law virtually identical in substance to those vacated in *Brown I.* We find that the second denial order does not comport with our mandate in *Brown I.*

Must we then once again remand Wilshire's application to the Banking Board and thereby extend this already lengthy and burdensome litigation? Under the totality of the demonstrated facts and circumstances of these particular cases and in the interest of judicial economy, we decide we are not.

■■ The clear purpose of the requirement that an administrative board, such as the Banking Board, set forth its findings of fact and conclusions of law with precision is to enable a reviewing judicial body to determine if the administrative decision, upon reviewing the entire record, is predicated upon "substantial evidence." Insofar as the Wilshire application is concerned, the Banking Board has twice failed to support its denial of the application with definitive facts. While it is not the function of this Court to substitute our judgment for that of the Banking Board in the matter of issuance or denial of state banking charters, we are not precluded from making a review of the whole record and entering the appropriate order indicated by the record in its entirety. *Brown v. Banking Board, supra.* In an effort to end this interminable litigation, we shall enter an appropriate and final order and judgment.

*Village Bank v. Seikel,* Okl., 503 P.2d 550 (1972) holds that the review to be made by the Court of Bank Review (and by this Court on certiorari) is the same character of review that this Court makes in an appeal from an order of the Corporation Commission to determine whether there is substantial evidence to sustain the Commission's Order. *Seikel* was modified in *Brown I* only to the extent that review would be of the entire record as opposed to reviewing only the evidence tending to support the order.

■ Under the rule enunciated in *Vose v. Banking Board, supra,* an application for a bank charter must be decided on its individual merits. One applicant cannot bolster its application by the proof of a competing applicant, nor may protestants preclude the success of an application solely upon failure of another application. In other words, Wilshire may not rely upon the proof of Hefner nor may Hefner or its protestants rely upon the denial of Wilshire.

In ascertaining whether the Banking Board's order is supported by substantial evidence, we are called upon to examine the record of the 1970 hearing together with certain undisputed facts proffered by Wilshire in support of their request to adduce additional evidence after remand.

Wilshire's evidence submitted in 1970 reflected that the closest bank was 2.9 miles distant and there were no banks north of the intersection of Wilshire, MacArthur, and Northwest Highway; that the population and economy to the north of proposed Wilshire was rapidly expanding; that the proposed primary service area was comprised of 3,865 housing units and approximately 12,900 people; that construction was either actually commenced, or financial commitment had been obtained for, approximately 500 additional apartments in the service area to be completed by the end of 1970, and there were 2,642 apartments planned for development by 1973; and that based on the single family dwellings to be built within the year following August,

1970, approximately 1,100 new families would move into the service area and single family dwelling units programed would increase from 3,467 to 4,630 by 1975.

The service area was composed of high income families and the average value of single family residence in the area was $28,000; that the median annual income in the service area was $13,000 as opposed $9,500 for the remainder of Oklahoma City; that 45% of the families in the service area had an annual income in excess of $15,000; that there existed 95 commercial establishments employing an average of ten employees each within Wilshire's primary service area and there were an additional 172 businesses located within the secondary trade area one mile south and east of the service area.

Perhaps the greatest economic impact on the service area arose from the $2,000,000 Hertz National Credit Card Center located just east of the proposed Wilshire Bank which was projected to, and did, open in January, 1971. It was estimated the Hertz Center would bring approximately 500 families into the primary and secondary service area motivating additional commercial development.

Research indicated that families in the proposed Wilshire service area could be expected, according to the American Banking Association surveys, to have a higher per cent of deposits in savings accounts rather than checking accounts. In the opinion of expert witnesses, Wilshire could therefore expect a higher time to demand deposit ratio than competing banks serving lower median income areas.

Although the expert opinion offered in support of Wilshire's application indicated the proposed bank would receive deposits from a third of area businesses, commercial accounts were not even included in projected deposits which, Wilshire maintains, is a conservative approach that supports their conclusion that a new state bank is needed in the area to serve the public.

Also supportive of this position was evidence that the 1970 retail sales in the service area of Wilshire amounted to $31.2 million. In this regard, uncontradicted evidence in the record discloses that retail sales have increased in the Lake Hefner area during the last decade at a higher rate of acceleration than any other area of Oklahoma City.

Projections for the area, while not determinative, should have been considered. Taking into account prior annual increases in residential construction, the average increase in development was projected to be approximately 19% per year resulting in the primary service area accommodating 12,500 dwelling units. The service area was considered, as of 1970, to be only 35% developed and to ultimately be comprised of a projected 40,000 persons.

The Banking Board, in November, 1973, in its second denial of the Wilshire application, set forth in its findings of fact, inter alia: that the proposed trade area would be approximately 21 square miles; that the intersection of Wilshire and MacArthur is not a major traffic thoroughfare in Oklahoma City; that Wilshire's projected deposits for the first year were approximately one-third larger than the other recently chartered banks in the area and therefore unreasonable; and that the public need would not be served by the establishment of a new state chartered bank in the proposed Wilshire trade area.

On the other hand, in support of issuing Hefner's charter in 1975, the Board found that what had been an area of "sparse" business and commercial development for Wilshire, was "characterized as one of rapid and extensive residential and retail commercial development" for Hefner. While for Wilshire the "service area will be limited in its future population growth by the existence of geographical barriers . . . an airport, public water supply lake, a public golf course, and a seminary", for Hefner it was a "reasonable probability" that this area of "extremely fast growth" would "continue its growth rate". The intersection which was "not a major traffic thoroughfare" for Wilshire, was an area of "heavy traffic flow" for Hefner. A population of 13,000 plus for Wilshire in 1970 projected to rise to 40,000, was in 1975 a

bank trade area in excess of 33,000 for Hefner. While for Wilshire in 1973 the conditions did not afford reasonable promise of success and the bank would not have promoted the public need and advantage, by 1975 because of the "growth in the area", Hefner Bank "would not only be a service to the community, but an economic and feasible operation." Also, in light of the "heavy traffic flow" and a survey which showed people of the area had a "positive attitude", the Board found the public need and advantage would be promoted by Hefner.

These comparisons are not set forth as evidence in support of the Wilshire application, but only to illustrate the patent inconsistency and arbitrary and capricious actions by the Banking Board in denying a charter to applicants whose projections were shown to be accurate while granting a charter to a subsequent applicant.

Again focusing upon the evidence and exhibits supportive of the 1970 Wilshire application, as opposed to the evidence in protest thereto, the evidence amply supported the issuance of Wilshire's charter. This conclusion is based not only upon actual conditions existing at the time in the trade area but also as to potential development in population and economic growth. In essence, the only evidence in opposition to the Wilshire charter quest came from competitor banks whose opinion essentially was that the particular trade area was "just not ready yet."

Additionally, of course, the Board denied Wilshire's fundamental right to a fair hearing in refusing its request for an opportunity to present evidence of changed conditions that verified its obviously correct initial projections.

The Wilshire Charter should have been granted by the Banking Board. Under the precedent of *Brown I,* we will not "rubber stamp" the orders of either the Banking Board or Court of Bank Review, but will enter the appropriate order indicated by the record in its entirety.

In Case No. 48,117, we therefore grant petitioners' request for certiorari to the Court of Bank Review, reverse the order of the Court of Bank Review and the order of the Banking Board with directions to the Banking Board to grant a state banking charter to the incorporators of the proposed Wilshire Bank, upon their compliance with regular lawful requirements.

As between these two parties Wilshire's application for writ of prohibition against the Banking Board from issuing Hefner's charter remains.

Granting a bank application when mutually exclusive applications are pending is a legislative matter. While this Court recognizes the constitutional embodiment of "superintending control" over inferior boards and judicial offices, "superintending control" does not carry with it the power to independently substitute the judgment of this Court for that of the Board or a body in whom the legislature has vested decision making authority, as noted above. However, with the order of this Court granting the Wilshire charter, fundamental fairness and economic protection of the public would best be served by prohibiting the Banking Board from issuing Hefner's charter, and ordering the Banking Board to conduct further hearings on the Hefner application in light of the ordered issuance of Wilshire's charter and the existence of Lakeshore National Bank.

Therefore, in Case No. 48,930, we assume original jurisdiction, and prohibit the issuance of the charter to the Hefner applicants by respondents Banking Board and the Commissioner, and direct that further hearings on the Hefner charter be held in accordance with the views expressed in this opinion.

## II.

Lakeshore's certiorari from the granting of Hefner's charter presents these major propositions for review: (1) That the Board erred in considering Hefner's application while Wilshire's denial was pending final determination; (2) That the Board erred in considering Hefner's application while

Lakeshore's application was pending approval; (3) That the Board erred in failing to allow Lakeshore to inquire as to the effect that granting one or more additional banks would have on the reliability of Hefner's evidence. The brief submitted by neighboring banks in No. 49,838 presents essentially the same arguments. As we have reversed the granting of Hefner's charter, and remanded that action for further proceedings by the Board, we are of the opinion that the points raised in these two actions have been resolved.

We note that in its arguments in opposition to Hefner's application, Lakeshore has urged this Court to adopt a "first in time—first in right" rule when dealing with competing charter applications between state and national banks. Lakeshore filed its application before Hefner. Wilshire, of course, filed its application long before Lakeshore; in fact, certiorari from its *second* denial was pending when Lakeshore applied for its charter. Wilshire was certainly the "first to file". We do not, at this time, adopt Lakeshore's "first to file" rule as the law of this jurisdiction. We are of the opinion, however, that for the purpose of any possible future litigation between these parties, Lakeshore has certainly agreed to and acquiesced in the correctness of granting Wilshire's charter application which was filed in 1970 and wrongfully denied long before Lakeshore applied for its national charter in 1974.

Lakeshore argued that Hefner applied for its charter with knowledge that Wilshire and/or Lakeshore might ultimately also be granted their charter applications. Lakeshore, of course, possessed the same knowledge of Wilshire's denial and pending appeal and chose to run the risk that Wilshire's denial might be set aside by this Court.

We deny certiorari in No. 49,837 and No. 49,838.

For purposes of clarity, in Case No. 48,-117, consolidated with No. 48,930, we grant certiorari, vacate the order of the Court of Bank Review and the Banking Board, and direct a charter issue under the name of Wilshire Bank to petitioners; and further prohibit respondents Banking Board and Commission from issuance of a charter to intervenors in Case No. 48,930 with directions to conduct further hearings not inconsistent with this opinion to determine whether or not the Hefner charter should issue in light of the order granting a state bank charter to Wilshire and in light of the existence of Lakeshore National Bank; and in Cases No. 49,837 consolidated with No. 49,838, certiorari is denied.

HODGES, C. J., and DAVISON, IRWIN, BERRY, BARNES and DOOLIN, JJ., concur.

LAVENDER, V. C. J., dissents.

WILLIAMS, J., not participating.