CITIZENS SECURITY BANK & TRUST, Bixby, Oklahoma; American National Bank & Trust, Sapulpa, Oklahoma; Security National Bank, Sapulpa, Oklahoma; and First National Bank, Jenks, Oklahoma, Appellants,

v.

The BANKING BOARD OF the STATE OF OKLAHOMA; John J. Livingston; Fred A. Setser; Rodger A. Randle, V. Lamar Miller; Thomas V. Sitrin; Scott Wilmott; Leo T. Wilmott; Allen R. Ratti; William E. Heflin; and First State Bank, Glenpool, Oklahoma, (Proposed), Appellees.

CITIZENS SECURITY BANK & TRUST, Bixby, Oklahoma; American National Bank & Trust, Sapulpa, Oklahoma; Security National Bank, Sapulpa, Oklahoma; and First National Bank, Jenks, Oklahoma, Appellants,

v.

The BANKING BOARD OF the STATE OF OKLAHOMA, Comprised of Dr. D. V. Van Horn, Acting Commissioner and Chairman, Mr. Don B. Donaldson, Mr. John T. Hannah, Mr. George V. Lowry, Mr. H. W. Ray and Mr. Robert Clark, Appellees,

and

John J. Livingston, Fred A. Setser, Rodger A. Randle, V. Lamar Miller, T. Wilmott, Allen R. Ratti, and William E. Heflin, For authority to engage in banking business, Applicants-Appellees.

Nos. 54332, 55218.

Supreme Court of Oklahoma.

Feb. 10, 1981.

Rehearing Denied April 27, 1981.

W. C. Sellers, Sellers & Harlan by John L. Harlan, Sapulpa, for appellants.

Jan Eric Cartwright, Atty. Gen. by John Paul Johnson, Oklahoma City, for Banking Board-appellees.

Kothe, Nichols & Wolfe, Inc., by Jerry R. Nichols, Tulsa, for applicants-appellees.

OPALA, Justice:

At stake in this consolidated cause is the correctness of a decision and of the proceeding by which a bank charter came to be granted. Protesting banks appealed to the Court of Bank Review and to the district court. The former affirmed the decision and the latter dismissed the appeal for want of subject-matter jurisdiction. From these adverse judgments, protesting banks

seek corrective relief. We consolidated the two causes.

The issues to be resolved are: [1] Does the Court of Bank Review have exclusive jurisdiction to review decisions of the Banking Board? [2] Was the Banking Board's order granting the charter sought by the applicants the product of lawful procedure? [3] Does that order rest on substantial evidence? We give an affirmative answer to all the questions posed.

Bank charter applicants—successful litigants below—sought authority from the Banking Board [Board] to organize the First State Bank and engage in business at Glenpool, Oklahoma. An application was filed with the Commissioner of the Banking Department [Commissioner] who instituted an investigation. A report was filed within the statutory 30-day period. Three days after the investigative report was submitted, an amended application reached the Commissioner. Following a hearing the Board ordered the charter granted.

I.

## JURISDICTION OF THE COURT OF BANK REVIEW

◼ Protestants assert the Court of Bank Review [CBR] was invalidly constituted by the Banking Code [Code] because all appellate jurisdiction is vested by Art. 7 § 4, Okl.Con., in the Supreme Court and no intermediate reviewing court may apply corrective process unless it is acting by direct assignment from the Supreme Court. They urge that CBR is an intermediate appellate court subject to this restriction. According to protestants, the provisions of the Oklahoma Administrative Procedure Act [APA] should be applied and the appeal from the Board's decision held to lie to the district court.[1]

The CBR—now abolished[2]—is expressly named in Art. 7 § 1, Okl.Con., where it is

---

1. 75 O.S.Supp.1977 § 318.

2. The Court of Bank Review was abolished by legislative act effective October 1, 1980, Okl.

Sess.L. 1980, Ch. 360 § 3 [6 O.S.Supp.1980 § 207]. This act is not applicable to this case because it was enacted while the proceedings here under review were pending in this court.

unmistakably recognized as the tribunal with an identity distinct from "intermediate appellate courts".[3] Its jurisdiction and continued existence—constitutionally made subject to the will of the legislature—was set forth in the Code[4] by which it came to be vested with power to hear and decide all appeals from any final order of the Board and its Commissioner.[5] It was authorized to affirm, reverse or modify any such decision or direct a disposition that "may be affirmatively required by law".[6] Its decisions were made reviewable by certiorari in the Supreme Court.[7] Procedure for certiorari access was governed by rules which required that a petition for review be filed "within 15 days after the issuance of any final order".[8]

While the APA does not prohibit appeals from the Board to be brought in the district court,[9] the Board is subject to the APA provisions only insofar as that act is "not in express conflict" with the Code.[10] Since the Code specifically provided for an appeal to the CBR, that provision must take precedence over any contrary terms in the APA. We hence hold that the district court's dismissal for lack of subject-matter jurisdiction did not offend any constitutional command and was clearly proper under the applicable statutory enactments.

3. The terms of Art. 7 § 1, Okl.Con., provide in pertinent part: "The judicial power of this state shall be vested in the . . . *Court of Bank Review . . . and such intermediate appellate courts* . . . Provided the . . . Court of Bank Review . . . shall continue in effect, subject to the power of the Legislature to change or abolish said Courts . . ." [emphasis ours].

4. 6 O.S.Supp.1978 § 207.

5. 6 O.S.Supp.1978 § 207(A).

6. 6 O.S.Supp.1978 § 207(C).

7. 6 O.S.Supp.1978 § 207(D).

8. Rule 2, Rules of Court of Bank Review, 6 O.S.Supp.1979, Ch. 1, App. 1.

9. The terms of 75 O.S.Supp.1977 § 318 provide in pertinent part: "[1] Any person or party aggrieved or adversely affected by a final order

## II.

## CLAIM TO ERROR BASED ON THE BOARD'S APPLICATION OF "UNLAWFUL PROCEDURE"

■ Protestants urge there was a fatal departure from the statutorily-prescribed procedure because the investigative report filed in the case assumed facts at variance with the original application then on file. The record reveals applicants had orally informed the Board's investigator of their intended amendment to the application by which they were to change the location of the proposed bank's situs and add three names to the list of investors. Although the investigator considered this information in the report, the scheme of statutory procedure may not have been strictly followed because the report had reached the Board before the conforming amended application came to be formally filed. We do not view this omission as fatally tainting the process.

The Code requires that an investigative report be submitted to the Commissioner within 30 days after an application for bank charter is filed.[11] Since the investigative report took into consideration the changes ultimately made by the amended application, the Board did not have to require that another investigation be conducted.

The Board was vested with "jurisdiction" when the application was filed and the pro-

in an individual proceeding . . . is entitled to . . . judicial review thereof under this act, but nothing in this section shall prevent resort to other means of review, redress, relief or trial de novo, available because of constitutional provisions. * * * "

10. *Brown v. Banking Board*, Okl., 512 P.2d 166, 168 [1973] (Brown I); *Brown v. Banking Board*, Okl., 579 P.2d 1267, 1271 [1978] (Brown II).

11. The terms of 6 O.S.Supp.1978 § 306(C) provide in pertinent part: "Within ten (10) days after the Commissioner shall have filed his report with the Board, he shall set a date of public hearing of the application before the Board. The date of hearing shall be within thirty (30) days following the filing of the Commissioner's report. * * * "

ceedings were commenced with the issuance of statutory notice. Once the Board's powers were so invoked, its cognizance continued with undiminished force. The amendment—oral or written—could not divest the Board of its authority.

Both the Board and the CBR found that protestants were not adversely affected or prejudiced by the post-filing changes in the original application. The amended application was filed with the Board three weeks before the hearing and well in time for issuance of proper public notice. Amendments disclosing the existence of changed conditions which affect the proposed bank's organization are proper and should be considered by the Board.[12]

Neither did the amendment detract from the merits of the application. The Board determined that a change in the location—a distance of one-half mile from the original situs in Glenpool but within the same trade area—would not result in a significant change in the protestants' survey which dealt with the original situs.[13]

We cannot say that the protestants did sustain their burden by showing that changes in the application prejudicially affected their ability to meet the issues or deprived them of the opportunity to do so. We hold the CBR correctly determined that there was substantial compliance with applicable law and no unfairness in the procedural departure.

## III.

## STANDARD OF JUDICIAL REVIEW GOVERNING BANKING BOARD DECISION

■ Protestants lastly contend the record is devoid of substantial, competent evidence to support "a present public need" for a bank in Glenpool or that the conditions in Glenpool and the trade area would insure the successful operation of the proposed bank.[14]

Judicial review of the Board's decision is governed by the substantial evidence standard.[15] The Board also is subject to reversal when its decision rests on "misapprehended or grossly misapplied" legal criteria.[16]

The substantial evidence standard of review is statutorily prescribed for both this court and the CBR.[17] An order of the Board may be reversed or modified if the reviewing court determines the order "is not supported by substantial evidence in the record".[18] The judicial determination is to be made from review of the entire record. This means, of course, that we must take into account not only the evidence which supports the Board's decision, but also that which contradicts the view taken by the Board.[19]

The record reveals that the primary service or market area for the proposed bank encompasses basically all of Glenpool and

---

**12.** In *Brown II*, supra note 10, at 1272–1273, we held the applicant's request for an opportunity to update the evidence was reasonable and proper. The Board's refusal to hear such evidence was deemed a "fatal deprivation of rights of applicants". In *State ex rel. Smith v. Banking Board*, Okl., 612 P.2d 257 (1980) we granted mandamus to compel a hearing on changed conditions.

**13.** The towns and surrounding rural areas of Glenpool, Mounds and Kiefer are included in the trade area to be served by the proposed bank.

**14.** The terms of 6 O.S.Supp.1978 § 306(F) provide that the " * * * Board shall not approve the application unless it ascertains to its satisfaction: (1) That the public need and advantage will be promoted by the establishment of the proposed bank or trust company; (2) That con-

ditions in the community in which the bank or trust company would transact business afford reasonable promise of successful operation; * * * ".

**15.** *Bank of Commerce, Stillwell v. Banking Board*, Okl., 534 P.2d 923, 924 [1975]; *In re Bank of Bixby v. Banking Board*, Okl., 524 P.2d 14, 16 [1974].

**16.** *In re Bank of Bixby v. Banking Board*, supra note 15, at 16.

**17.** 6 O.S.Supp.1978 § 207.

**18.** 6 O.S.Supp.1978 § 207(C)(4).

**19.** *Brown I*, supra note 10; *Brown II*, supra note 10.

extends to the communities of Mounds and Kiefer, in none of which is there a bank in operation. A survey of the residents and businesses in the trade area was completed in an effort to determine the proposed bank's feasibility. Personal interviews were conducted with 190 residents and 46 businesses. The total population of the trade area is estimated at 8,000 persons, approximately half of whom reside within the limits of the towns that were included. Glenpool's growth doubled during the period from 1970 to 1979. During the same period, the trade area increased in population by approximately one-third. From 1971 to 1978 deposits made in two of the protesting banks, which now service the trade area, increased some one hundred percent. Two other protesting banks servicing the area under consideration experienced a growth rate of two hundred percent. Some 76% of the persons living in the area surveyed are likely to become the new bank's customers. There is a high loan-to-deposit ratio in the surrounding banks. Area residents who were surveyed gave as their primary reason for choosing a particular bank the convenience of its location.

The Board found that the high loan demand being experienced by the area-servicing banks reflects a "present and continuing need for additional bank loans" in the proposed trade market. The continued growth of Glenpool is reflected by the influx of new families, increased sales tax collections and new residential and commercial construction. The availability of water, sewer and related utility requirements is deemed a factor which will help to insure the continuation of the remarkable growth pattern.

Contradictory to the Board's findings is the testimony showing that the multi-bank automatic teller machine [ATM] could adequately serve the needs of the proposed trade area. According to some witnesses, the ATM would perform in Glenpool area the majority of service functions needed by the average customer. One of the protestants' claim to error directs us to an absence of evidence, both in the investigative report and in applicants' expert proof, as to the potential effect the proposed installation of an ATM would have on the "need" and "successful operation" of the proposed bank. At the time of the hearing in suit the ATM had been neither approved nor placed in operation. According to the evidence, an ATM facility is not a substitute for a full-service bank. Its capacity for service to customers is limited.[20] As the trial record indicates, the Board declined to assess—for lack of measurable data—the impact of an ATM installation to be located near the proposed bank site.

We note the presence of some other evidence which favors protestants' position. It shows that three banks, situated within a seven-to-eight-mile radius, currently serve the needs of a large portion of the proposed trade area; and there is no major shopping center or grocery store in Glenpool. A majority of the residents of the proposed trade area work and shop outside of Glenpool.

■ Mindful, as we are, that the Board is not limited to evidence of present market conditions but may also consider the potential development in, and economic growth of, the area,[21] we find that there is clearly substantial evidence in the record to show that a present need does exist for a bank in Glenpool. We have no authority to substitute our own judgment of the facts for that of the Board.[22] There exists no tenable legal ground for reversing the administrative action of the Board.

The decision of the Court of Bank Review affirming the Banking Board's grant of a charter is accordingly affirmed. The district court's judgment declining to under-

---

**20.** An ATM cannot be used, *inter alia*, to make loans, open checking and savings accounts, or obtain certificates of deposit or cashiers checks. Statutes also limit the function of an ATM installation. 6 O.S.Supp.1976 § 422.

**21.** *Sebring v. Caporal*, Okl., 452 P.2d 777, 779 [1969]; *Brown I*, supra note 10; *Brown II*, supra note 10.

**22.** 6 O.S.Supp.1978 § 207(C)(1–4); see in this connection 75 O.S.1971 § 322(1)(e).

take a review of the Board's decision for lack of statutory power is also affirmed.

BARNES, V. C. J., and WILLIAMS, LAVENDER, SIMMS, DOOLIN and HARGRAVE, JJ., concur.

HODGES, J., dissents.