**ST. ELIZABETH HOSPITAL, Appellant,**

v.

**Floyd Eugene GRAHAM, Appellee.**

No. 09–93–253 CV.

Court of Appeals of Texas, Beaumont.

Sept. 15, 1994.

Rehearing Overruled Oct. 6, 1994.

Patricia D. Chamblin, John D. Rienstra, Jr., Dewey J. Gonsoulin, Mehaffy & Weber, Beaumont, for appellant.

Clay Dugas, David Dies, Dies, Dies & Henderson, Orange, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

An appeal from a judgment adverse to St. Elizabeth Hospital. The district court case was a suit for damages brought by the plaintiff Floyd Graham (Graham) against St. Elizabeth Hospital (St. E.) claiming that Graham was negligently injured on or about February 17, 1989, while recuperating from a severe head injury sustained by him six days earlier.

On February 11, 1989, Graham apparently was driving alone in his truck quite late at night near Vidor. Graham's vehicle left the road and struck an embankment. In that collision Graham's head struck a part of his own truck. The blow resulted in a comminuted depressed skull fracture as well as a basilar skull fracture. In a comatose condition he was transported to St. E. Dr. Hirschauer performed a craniotomy on Graham. Graham was taken to the Neuro Intensive Care Unit where he remained until February 18th. He was then transferred to the neurological unit of St. E. He was discharged on March 4, 1989.

Graham instituted litigation seeking actual and punitive damages, alleging that St. E. was guilty of ordinary negligence and gross negligence, principally in failing to restrain him or to use restraints to keep him from falling out of a recliner chair in the Neuro IC Unit on February 17, 1989. St. E. moved for a bifurcated trial in this civil suit. The bifurcated trial was denied. Over St. E.'s objection the plaintiff was successful in introducing the net worth of the hospital in the presence of the jury. The verdict declared St. E. guilty of ordinary negligence but not gross negligence. The damage award to Graham was in the sum of $1,250,000 in actual or compensatory damages. The court also rendered judgment in favor of Graham for pre-judgment interest in excess of $216,-000.

■ St. E. presents eight points of error. The first two are grouped and briefed together. The first two points are: (1) the trial court erred in denying the defendant's motion for a bifurcated trial on punitive damages and erred in allowing the jury to hear or consider the net worth of St. E. The net worth, it is argued by St. E., was clearly prejudicial and constituted harmful error; and (2) that the trial court erred in admitting evidence of St. E.'s net worth during the trial of the case inasmuch as St. E. argues there was no evidence of gross negligence on the part of the hospital. Again, the jury failed to find gross negligence against St. E.

Graham, citing Lunsford v. Morris, 746 S.W.2d 471 (Tex.1988), required St. E. to disclose its net worth to plaintiff's counsel. In Lunsford, it was held that a civil defendant's net worth is a relevant and material factor on the issue of punitive or exemplary damages and therefore, net worth was discoverable. Lunsford did not require a threshold showing of gross negligence before offering evidence of net worth. Lunsford holds that in cases in which punitive or exemplary damages may be awarded the parties involved may discover and offer evidence of the defendant's net worth. This information was obtained through answers to plaintiff's interrogatories. Plaintiff had pleaded for punitive damages.

Before the trial, St. E. filed a motion for a separate or bifurcated trial on the issue of punitive damages. St. E. argued that the results of refusing to grant the separate trial would be misleading, inflammatory, and prejudicial without first submitting to the jury the issues of causation, liability, actual compensatory damages, and gross negligence.

St. E. also cited and argued to the trial court TEX.R.CIV.P. 174 concerning separate trials. The trial court, in denying the bifurcated trial, ruled that once the district court had determined that there existed some evidence of conscious indifference, then the trial judge would allow the plaintiff's counsel to present evidence of St. E.'s net worth to the jury. Under these first two points of error St. E.'s able counsel argues also that the plaintiff presented no evidence at all of ordinary negligence and no evidence at all of gross negligence.

Graham counters, stating that he was very seriously injured and sustained damages resulting from a fall in the neuro ICU of St. E.'s on February 17, 1989. Graham was recuperating after a surgical procedure. Graham's injuries, he alleges, occurred when, unrestrained and unattended, he fell from a recliner chair where he had been placed by a nurse employee of St. E.

Graham argues that on previous occasions St. E. and its employee-nurses had used restraints or other means of caring for patient Graham. Graham states that on the day before his fall in the hospital, he had been visited by his mother. On that immediately previous day, Graham maintains but for the intervention of his visiting mother standing next to the recliner chair that he would have fallen.

These facts were reported to the proper persons by Graham's mother but the following day Graham was again placed in the recliner unrestrained. Graham was later discovered on the floor next to the recliner chair. He was disoriented and bleeding from his ear. His fall to the floor was hard enough and resulted in a loud noise that a nurse heard. She described the noise as a "bang". Graham asserts that the nurse assigned to care for him had not restrained him

and was not observing him at the time of the fall.

Plaintiff, through his pleadings, had pointed out that St. E. had allegedly violated its own policies of safety and its own policies concerning the use of restraints in similar circumstances. Graham pleaded other grounds of negligence as well as gross negligence. Appellee argues in his responses to points of error one and two that he did demonstrate and offer evidence adequately *raising the issue of gross negligence.* The trial court at that time—but not before— ruled that Graham had satisfied the necessary evidentiary threshold matters and allowed Graham to introduce certain concise evidence of St. E.'s net worth.

Graham argues that at this time the only evidence of net worth that went before the jury was the plaintiff's attorney advising that some questions had been sent to the defendant which had to be answered under oath. One of the questions was: "Please state the net worth of Defendant, St. Elizabeth Hospital." The answer to that question was: "$148,954,725.00".

St. E. argues that the trial judge abused his discretion in not granting the separate trial; not surprisingly, Graham states that the trial court had broad discretion concerning bifurcation. Graham argues that it was St. E.'s burden to show an abuse of discretion by the trial judge and that St. E. has offered nothing to show an abuse of discretion. Simply put, Graham pronounces that there was no evidence of any prejudice or harm to the detriment of St. E.

Further, Graham maintains that at the time of the trial, the correct procedure did not mandate that evidence of net worth had to be presented in a bifurcated trial after the jury found gross negligence.

Graham and St. E. both argue that our Ninth Court should follow the guidelines in *Transportation Insurance Co. v. Moriel.* However, each argued a different interpretation of the February 2, 1994, opinion. The Texas Supreme Court first handed down an opinion in *Moriel* on February 2, 1994, which was reported at 37 Tex.Sup.Ct.J. 450. That

opinion was subsequently withdrawn and a new opinion was issued on June 8, 1994. Graham maintains that the standard and rule pronounced in *Moriel* applies to all punitive issue *cases that are tried in the future*—but not those cases tried in the past. *Moriel* was decided June 8, 1994, while the case at bar was on appeal.

Both appellant and appellee filed individual reply briefs in which they cited *Transportation Insurance Company, et al. v. Juan Carlos Moriel,* 37 Tex.Sup.Ct.J. 883 (June 8, 1994)—now reported at 879 S.W.2d 10. *Moriel* held, we perceive, that the necessity of a bifurcated trial applied only to cases that were to be tried in the future, after June 8, 1994. St. E. was not entitled to a bifurcated trial as a matter of right; nor has St. E. shown an abuse of discretion on the part of the trial judge in permitting into evidence its net worth.

If Graham had recovered punitive damages, we conclude under the real *Moriel* that our Ninth Court of Appeals:

[M]ust carefully scrutinize punitive awards to ensure that they are supported by the evidence. We have already held in *Pool* [*v. Ford Motor Co.,* 715 S.W.2d 629 (Tex. 1986) ] that courts of appeals, when reversing on insufficiency grounds, should detail the evidence in their opinions and explain why the jury's finding is factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust. 715 S.W.2d at 635. Due to the jury's broad discretion in imposing punitive damages, we believe that a similar type of review is appropriate when a court of appeals is *affirming* such an award over a challenge that it is based on insufficient evidence or is against the great weight and preponderance of the evidence. This will ensure careful appellate review of the punitive award, and allow this court to determine whether the court of appeals correctly applied the *Kraus* factors[1]. *Thus, we hold that the court of appeals, when conducting a factual sufficiency review of a punitive damages award, must hereafter detail the relevant evidence in its*

---

1. These factors are delineated in *Alamo Nat.*

*Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981).

*opinion, explaining why that evidence either supports or does not support the punitive damages award in light of the Kraus factors.* (emphasis added) (footnote added)

*Moriel,* 879 S.W.2d at 31.

Since the jury awarded absolutely no punitive damages, we have no duty to perform this tedious task which has been thrust upon us.

Nor did the trial judge commit error in failing to order a separate trial on the issue of punitive damages under TEX.R.CIV.P. 174 as that rule applied prior to *Moriel. Moriel* and progeny *may* require a re-visiting of TEX.R.CIV.P. 174. St. E. charges otherwise. TEX.R.CIV.P. 174(a) on "Consolidation" and (b) on "Separate Trials" are permissive, reading that a trial court may order consolidation or not. Rule 174(a) gives the broadest type of discretion to the trial bench in providing that the trial court "may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." We conclude that since Rule 174 speaks in terms that empower the trial court to use broad discretion involving separate trials that no error was shown. However, under the present status of the law following *Moriel,* the broad discretion once afforded the trial court by Rule 174, is now limited in matters relating to punitive damage allegations or punitive damage actions. Undoubtedly, *Moriel* is going to mandate a revision of Rule 174. We overrule appellant's points of error one and two.

■ The points of error three and four of St. E. are grouped together and briefed together. Point three states the trial court erred in entering judgment on the jury verdict for the plaintiff *because there was no evidence to support the jury's findings that the defendant St. E. was guilty of negligence proximately causing injuries to Graham.* Point four states the trial court erred in denying the defendant's motion for new trial because there existed factually insufficient evidence to support the jury's findings of negligence and also the jury's finding to Question 1 was against the overwhelming weight of the evidence.

In reviewing a "no evidence" point, an intermediate appellate court is to consider only the evidence and testimony favorable to the jury's findings and all reasonable, favorable inferences reasonably flowing therefrom. All contrary evidence and contrary inferences are to be disregarded. All contrary evidence to the jury's answer to Question 1 must be disregarded. All unfavorable inferences reasonably resulting from the contrary evidence must likewise be disregarded. *Sherman v. First Nat. Bank,* 760 S.W.2d 240 (Tex.1988); *International Bank, N.A. v. Morales,* 736 S.W.2d 622 (Tex.1987).

Several nurses who were employees of St. E.'s testified. Some worked in the neuro ICU on the day of Graham's fall and some had worked or were working in the neuro ICU in February of 1989. The employee-nurses testified that they had knowledge of the nursing service policies of their employer regarding safety and restraints. Some nurses admitted that it was not necessary to have a doctor's order to apply appropriate restraints.

The evidence of the nurses demonstrated that they had discretion to apply restraints to prevent confused, disoriented, woozy patients or to patients who did not possess sufficient physical control to avoid falling and thus sustaining new, further injuries and damages, or aggravating previous injuries. Graham was such a patient. St. E.'s policies and rules were for the purpose of the furtherance of the patient's safety and the prevention of aggravation of injury or a new injury. The jury had the benefit of the testimony of the charge nurse and the managing nurse for the neuro ICU. Graham had fallen from a recliner chair.

A licensed, registered nurse with experience in neuro intensive care units, after reviewing the hospital records of Graham and also reviewing the nursing policy standards of St. E., testified that the employees of St. E. had violated St. E.'s own standard of care by not restraining Graham in the recliner chair.

An oral deposition was offered by an expert neurologist. A videotape of the same expert was played. The videotape and the deposition contained evidence of probative

force and evaluation demonstrating the defendant's negligence in failing to restrain the plaintiff while he (Graham) was in the recliner chair. Plainly, a jury issue was competently raised. The medical expert, the neurologist, testified that it would be more difficult for a patient such as Graham to fall and to injure or to re-injure himself while wearing a posey vest while being positioned in a recliner chair. This neurologist opined that in light of the problems and in light of the general physical condition of Graham (from which condition he was suffering under at the time he was in the neuro ICU) that Graham should not have been placed in a recliner chair without restraints. His testimony went further. His testimony was to the effect that any patient in a neuro ICU suffering from problems, disabilities and complications such as those of Graham should not be placed in a recliner chair without restraints. These medical opinions were based upon reasonable medical probability.

This same witness, Dr. Dale B. Haufrect, gave his expert opinion that the placing of Graham in a recliner chair without restraints was a failure to exercise the degree of care that a reasonably prudent neuro intensive care nurse or institution would have exercised in the same or similar circumstances.

The record reflects additional evidence on this point. As an example, the record reflects that Graham was confused post-operatively. He was not following instructions. He was somewhat combative. Graham was not well oriented; nor was he coordinated in his arms. Graham suffered from alternating monoparesis. The patient had sustained a moderately severe concussion. These factors required reasonably careful restraints and monitoring so that the patient did not fall and die. Applying long-established standards of intermediate appellate review, we overrule appellant's point of error three.

In passing on a "factually insufficiency of evidence" point, we are to consider all of the evidence in the case, both favorable to the jury's findings and unfavorable thereto. We are also to consider the favorable inferences and the unfavorable inferences. In doing so, however, we are governed by the rules that the jury is the judge of the facts and the weight to be given the evidence. The jury's duty and power are to pass upon the credibility of the witnesses.

A Texas jury's prerogatives are broad. A jury may believe all of the testimony of a witness or none thereof. The jury may believe part of the testimony of a witness and disbelieve other parts of that same witness' testimony. The jury's findings are to be left undisturbed, if there is some evidence of probative force and evaluation to sustain the findings and the verdict. Some cases state that the verdict of the jury is to stand if there is any evidence more than a scintilla to support the jury's answers. We overrule point of error four. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960); St. John Garwood, *The Question of Insufficient Evidence on Appeal*, 30 Tex. L.Rev. 803 (1952). *See also* William Powers, Jr. and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence"*, 69 Tex.L.Rev. 515 (1991).

■ In point five, the appellant charges error in that the trial court did not grant St. E.'s motion to strike the new testimony of Dr. Dale Haufrect. And St. E. charges that the court erred in failing to grant a motion for continuance.

Dr. Haufrect's videotaped deposition was taken on or about June 20, 1992. This physician had testified that he had taken a history from Graham and had performed a physical and neurological examination. He was made aware of the surrounding facts relevant to the incident in litigation and also he had reviewed Graham's physical therapy history. In brief summary, Dr. Haufrect's opinion and impressions addressed the questions of post-concussion syndrome, Broca's Aphasia, right hemiparesis, right hemihypesthesia, and amnesia, as well as other medical entities and diagnoses.

These medical conditions, according to the doctor, related to a left-sided brain injury. This left-sided brain injury related to and was said to be a result of the fall in the hospital. The doctor testified that he was

unaware of any language problem affecting Graham prior to the fall in the hospital but that such a language problem was evident after the fall. Graham had deteriorated in his speech.

It is concluded that the plaintiff's expert and his opinions remained unchanged after he had reviewed various reports, x-rays, MRIs, CT scans, and other medical evidence. One report introduced as an exhibit states in substance:

It is still my opinion that this young man, Mr. Graham, suffered a change for the worse in his clinical presentation following the fall from the chair as described.

The district judge heard the arguments on the defendant's motion to strike Dr. Haufrect's testimony. The trial judge noted that the doctor's opinion remained unchanged and found no valid ground upon which to grant St. E.'s motion to strike. Additionally, the trial court proposed and granted to the defense the right and the opportunity to take another deposition of Dr. Haufrect.

Graham agreed, in essence, to this new arrangement and deposition. The counsel for defendant acquiesced and a retaking of the deposition of Dr. Haufrect was accomplished in sufficient time for consultation by defense counsel with its own experts. These matters were concluded timely. There was no abuse of discretion. To sustain this point of error number five, our appellate court would have to clearly determine that the trial court's arrangements and orders were so arbitrary, unreasonable, and capricious (or were based upon great and gross prejudice) so as to clearly establish an abuse of discretion. We decline to do so and overrule point of error five. No error is shown. No harm is shown. The court's orders, decisions, and procedures relevant thereto would have to be such as would reasonably be calculated to cause and probably did cause rendition of an improper judgment. TEX.R.APP.P. 81(b)(1).

■ St. E. complains in its point of error number six that the trial court committed error in failing to strike the testimony of Dr. Robert Voogt and committed further error in admitting Dr. Voogt's testimony concerning the plaintiff's future medical needs and expenses. We disagree.

Dr. Voogt was offered as an expert in rehabilitation and life planning for persons with brain injuries. This expert had formulated a lifecare plan for Graham. The trial bench prudently and cautiously considered the matter. The bench ultimately decided that it was for the jury to determine whether the problems of the plaintiff were caused by the fall rather than by the previous original truck accident.

An important, ultimate fact and issue in the litigation was the correct, reasonable amount of future lifecare needs of Graham. Again, these issues were for the jury to decide. These included future medical expenses that were reasonable and necessary and resulted as the proximate result from the fall in the hospital. The determination of these matters, under this record, were in reality fact issues for the jury. Dr. Voogt's testimony was relevant and material. His expert testimony, as placed before the jury, possessed a tendency to make the existence of such necessary fact issues more probable than without any such evidence. *See* TEX. R.CIV.EVID. 401, 403. Dr. Voogt qualified as a rehabilitation counselor and rehabilitation specialist. TEX.R.CIV.EVID. 702.

■ To successfully show error, or certainly reversible error, in connection with the trial court's ruling on either the admissibility or the inadmissibility of evidence, it must not only be shown that error was committed and that an abuse of discretion was committed, it must also be shown that such ruling and action was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. TEX.R.APP.P. 81(b)(1). St. E. has failed to show such error in connection with their points of error five and six; the same are overruled. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394 (Tex.1989).

■ St. E. presents as a group points of error seven and eight. Points seven and eight are argued together and briefed together. Point seven states the trial court erred in denying the defendant's motion for new trial because there was factually insuffi-

cient evidence to support the jury's finding to Question 2, and alternatively, the finding to jury Question 2 was against the overwhelming weight of the evidence. Point eight averred that the trial court erred in denying the defendant's motion for a new trial and not ordering a remittitur on damages because the jury's finding to Question 2 was excessive and was the result of bias and prejudice.

Question 2 was the damage issue. The jury awarded the plaintiff $1,250,000 for physical pain and mental anguish in the past and in the future, loss of earning capacity in the past and in the future, disfigurement, physical impairment, and future medical care as a result of the injuries sustained and resulting from the occurrence or the fall out of the recliner chair which took place on February 17, 1989.

One of the theories of recovery of damages by the plaintiff's case was that the evidence, both lay and medical, made it clear that Graham's damages being sued upon resulted from a left-side brain injury occurring as a result of the fall of February 17, 1989. The strategy of the plaintiff's case was—and by strategy we do not intend any negative connotations—that the truck accident of February 11, 1989, involved the right side of the brain. Louise Nixon, the plaintiff's mother, testified that after the truck accident—but before the fall out of the recliner chair—her son was cognizant of his surroundings and could speak. He knew his family. He evidenced concern about the condition of his truck. He was worried about his being able to return to his employment. He had no apparent neck pain or shoulder pain before the fall. As noted above, the mother testified that she was a witness to an occurrence wherein the plaintiff, Graham, almost fell out of a recliner chair because the chair was unstable; he was not restrained in the unstable chair.

After this near fall, she testified that she forcefully told the nurse of the problem and requested that he be restrained. Further, she testified that on the very next day Graham fell. He had been left unrestrained and unattended. He had struck the side of his head and had blood and fluid coming from

his ear; he had a bruise on his right shoulder; after the fall from the chair, the plaintiff was simply not the same person. His appearance was visibly changed. His left eye was "walled back". His mouth drooped. Graham could not talk to his mother coherently. Graham only mumbled.

Eddie Graham, the plaintiff's brother, testified. Eddie stated that after the truck wreck when his brother Floyd Eugene regained consciousness in the Neuro Intensive Care Unit, that Floyd had no problem with speech, no noticeable change in his personality, no noticeable change in his thinking processes. Floyd was exhibiting improvement. Eddie testified that after the fall his brother Floyd was weak, had poor memory, his side was weak, he suffered from personality disorders, his thinking clarity was diminished, his mouth drooped. There was much other lay testimony. This lay testimony described in detail Graham's condition before the fall and after the fall. We note from the statement of facts that much of the lay testimony was from the relatives of Floyd Eugene Graham.

■ However, under the most accepted and the most firmly established law in Texas, the jury is to weigh the evidence and to attach what credibility it deems proper. In other words, these matters, it seems to us, that the appellant complains about in these last two points of error are matters which had to be resolved by the jury. Simply put, these issues were strictly jury issues and the jury was acting well within its own province. After all, jury findings under the Texas Constitution are inviolate. TEX.CONST. art. I, § 15.

The plaintiff introduced, however, expert medical evidence as well as lay witnesses. Various radiographs, CAT scans, and MRI results and reports were taken both prior to and after the fall from the chair. Certain x-rays before the fall revealed a fairly normal cervical spine; yet x-rays taken after the fall of February 17th showed a mild narrowing of the C6–C7 interspace and a mild marginal bony lipping anteriorly.

The CAT scan of February 12th showed the depressed fracture while the later CAT

scan revealed edema and blood in the brain of Graham. Dr. Haufrect testified to various disabling conditions. He related these to the left brain injury caused by the fall. This doctor referred to the edema shown on the later CAT scan. He stated: "We know it was there after the fall from the chair. We know it wasn't there prior to that, and those are facts. They are facts that are irrefutable, and they are real." This same Dr. Haufrect had reviewed the x-rays and x-ray reports and concluded that the change in the x-rays indicated a compression injury caused by the trauma to his neck. Physical therapy reports of the hospital reveal that after the fall the plaintiff complained of and received treatment for injuries to his neck and to his shoulder. There is additional evidence from Dr. Haufrect. His evidence was to be weighed and evaluated and passed upon as to all its aspects by the factfinders. His testimony was unambiguous that the cause of plaintiff's impairment was due to injuries sustained in the fall and not from the truck accident. We quote:

All I can tell you is that before the trauma from the chair where he fell out of the chair, he didn't have an aphasia or aphemia or right hemiplegia in the pyramidal predilection. After the fall from the chair, we find that he has got a right hemiplegia and an aphemia. Those are facts. They are pure, simple, straightforward, clear facts.

. . . .

And from looking at all of that and from interviewing the patient, I have the impression, based on reasonable medical experience of 20 years' experience of teaching medical students in both medical schools and one of the largest medical schools in the United States of America, that this person suffered aphemia, aphasia, and right hemiplegia following his fall from the chair. That seems to me, at least, to be the nidus of these disorders, not the initial accident from the car.

In response to further questioning repeated in detail, this doctor opined that the plaintiff's disabilities and impairments were the result of injuries sustained in the fall. This same doctor was certain that Graham would require constant medical expenses for the rest of his life and that the cost of the *care would be in the hundreds of thousands of dollars up to a million dollars.* An exact, precise amount in dollars and cents was not given. However, the jury again in the exercise of its time-honored Texas prerogatives, passed on these disputed issues.

There was testimony from one Dr. Lawrence Dilks, a neuropsychologist. His testimony was that plaintiff's damages resulted from a left side brain injury and his testimony also refutes any contention of insufficiency of evidence as to future medical damages as a result of the fall of February 17th. Dr. Dilks testified that right side brain damage or injury which resulted from the truck accident was mild and being of the lowest rating and that the plaintiff's impairment from such right side brain injuries would not affect his functioning to any great extent and further, any such impairment would not affect his ability to function in society.

Additionally, there was further evidence from nurses. One nurse testified that the plaintiff, Graham, was not restrained on the day of the fall and that when he hit the floor she heard a "bang". Another nurse testified that plaintiff was found on the floor at about noontime. He was bleeding through his right ear and around the suture area of the surgery. Then about one hour later the plaintiff was oozing fluid from his ear and his level of orientation was reduced considerably.

Mr. Allen Simpson, a rehabilitation specialist, testified that in his opinion the plaintiff was not qualified to work and that the federal government had declared the plaintiff to be totally and permanently disabled. Mr. Simpson testified that plaintiff's loss of future earning capacity was in the range of anywhere from $450,000 to $600,000. Dr. Robert Voogt, also a rehabilitation specialist, testified that the plaintiff was totally and permanently disabled, had a life expectancy of about thirty-six years and the cost of maintenance and care would range from between $63,000 to about $133,000 per year.

Again applying the accepted standards of appellate review, we are constrained, under this record, to overrule the challenges that maintain that there was factually insufficient

evidence to support the answer to Question 2. Also applying long-accepted standards, *we do not conclude that the answer to No. 2 is against the overwhelming weight and preponderance of the evidence so as to be clearly unjust and manifestly wrong.*

In the record, we conclude that there is ample and sufficient evidence of probative force and evaluation to support and sustain the jury's finding to Question 2 and the jury's answer to Question 2 is not against the overwhelming weight of the evidence. We note that Question 2 was the damage issue and the way it was worded the judge carefully charged the jury that it was to consider only the elements of damages listed below within the question. The jury was to consider each element separately. The jury was strictly instructed not to include damages for one element in any other element. The jury was not to include interest on any amount of damages awarded, if any, that might be found by the jury. There were other restrictions.

The charge listed elements as follows:

a. Physical pain and mental anguish in the past and in the future.

b. Loss of earning capacity in the past and in the future.

c. Disfigurement.

d. Physical impairment.

e. Future medical care.

Answer in dollars and cents for the damages, if any, that were sustained.

Answer: $1,250,000

Under the instructions, the jury could only consider Graham's injury, if any, resulting from the occurrence on February 17, 1989.

■ If there exists more than a scintilla—as is the case here—then we are to confirm the jury's verdict. We cannot serve as a super juror or as a thirteenth juror. We are not empowered to convert some evidence of some probative value into no evidence. Even when considering all the evidence including evidence that is contrary to the verdict in a factual sufficiency or insufficiency review, an intermediate appellate court may not substitute its judgment for that of the jury. *See Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442 (Tex.1989); *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646 (Tex.1988). In determining "factual sufficiency of the evidence" points of error, we are not empowered to reweigh the evidence or reevaluate the credibility of the witnesses.

Under its points seven and eight, St. E. relies upon two cases: *Kulms v. Jenkins,* 557 S.W.2d 149 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.); *Texas & N.O.R. Co. v. Barham,* 204 S.W.2d 205 (Tex.Civ.App.—Waco 1947, n.w.h.). If these decisions are not inapposite, clearly they are not controlling here. The *Jenkins* case and the *Barham* case pronounce the rule that an injured plaintiff is not necessarily entitled to recover the medical expenses for which he has obligated himself. Instead, a plaintiff is entitled to recover only those reasonable medical expenses which were or will be necessarily incurred as a result of the incident sued upon. The careful trial judge prudently restricted the element of future medical care to that which resulted from the occurrence of February 17, 1989, the date of the fall from the recliner chair. No error is shown. No harm is shown. Again, it was a jury issue. We are constrained to overrule points of error seven and eight.

After carefully analyzing each one of St. E.'s points of error one through eight, we overrule the same. On remittitur, we have carefully reviewed the record. We have determined that Tex.R.Civ.P. 315 on remittitur has not been violated and Tex.R.App.P. 85(a), (c) do not indicate any remittitur is appropriate. We decline to order a remittitur because the jury's finding is not against the overwhelming weight and preponderance of the evidence. Nor is the jury's answer under the entirety of the record so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust and clearly wrong. We do not find that there has been any showing of bias or prejudice or animus or any other type of improper emotion or feeling detrimental to St. E. Thus, the trial court did not err in denying St. E.'s motion for a new trial nor did it err in failing to order a remittitur on the damages. The judgment below is affirmed.

AFFIRMED.