STEELE, Appellant,

v.

BUXTON, Appellee.

[Cite as *Steele v. Buxton* (1994), 93 Ohio App.3d 717.]

Court of Appeals of Ohio,
Crawford County.

No. 3–93–20.

Decided March 23, 1994.

*Weldon, Huston & Keysor* and *David D. Carto,* for appellant.

*Porter, Wright, Morris & Arthur* and *Kenneth S. Blumenthal,* for appellee.

SHAW, Presiding Judge.

Plaintiff-appellant, William E. Steele, appeals from the judgment of the Common Pleas Court of Crawford County granting summary judgment in favor of defendant-appellee, John A. Buxton, M.D.

The record reveals that on December 12, 1984, Dr. Buxton performed a modified Bassini herniorrhaphy on the appellant. Thereafter, the appellant brought this medical malpractice action against Dr. Buxton alleging that Dr. Buxton negligently performed that surgical procedure. At trial, William C. Manthey, M.D., was to be the appellant's sole medical expert concerning the alleged negligence.

On the morning of the trial, appellee filed a motion *in limine* to preclude the testimony of Manthey. After allowing counsel to conduct a voir dire examination of Manthey on his qualifications, the trial court held that Manthey was not qualified to testify as an expert witness in this case. At that time, appellant was granted a continuance in order to obtain a qualified expert witness.

After appellant failed to obtain a new expert within that time, the trial court granted appellee's motion for summary judgment on the ground that appellant's expert was not qualified to testify.

Appellant now appeals from the trial court's decision and asserts the following two assignments of error:

"I. The trial court erred by granting defendant-appellee's motion in limine precluding plaintiff-appellant's expert medical witness from testifying upon the issue of surgical malpractice on the grounds that he was not qualified to do so.

"II. The trial court erred by granting defendant-appellee's motion for summary judgment upon the basis that plaintiff-appellant offered no qualified medical expert opinion testimony upon the issue of medical negligence."

Evid.R. 601 governs the competency of witnesses and provides, in pertinent part, as follows:

"Every person is competent to be a witness except:

" * * *

"(D) A person giving expert testimony on the issue of liability in any claim asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist, unless the person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state

medical board or by the licensing authority of any state, and unless the person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school." [1]

Evid.R. 702 permits the use of expert testimony and provides as follows:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Where "fields of medicine overlap and more than one type of specialist may perform the treatment, a witness may qualify as an expert even though he does not practice the same specialty as the defendant." *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 158, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566. A review of the medical expert cases shows that a nonspecialist is qualified to testify as an expert when he is familiar with the procedure used by the specialist. For example, in *King v. LaKamp* (1988), 50 Ohio App.3d 84, 553 N.E.2d 701, a physician specializing in orthopedic surgery, including foot surgery, was deemed qualified to testify on the procedures employed by the defendant podiatrist because he demonstrated sufficient familiarity with those particular procedures.

Further, as the Supreme Court of Ohio stated in *Alexander, supra,* 56 Ohio St.2d at 159, 10 O.O.3d at 334, 383 N.E.2d at 566, an expert witness need only aid the trier of fact in the search for the truth and need not be the best witness on the subject.

Evid.R. 104(A) provides that preliminary questions concerning the qualification of a person to be a witness must be determined by the court. A trial court's ruling on the witness's qualification or competency to testify as an expert will ordinarily not be reversed on appeal unless there is a clear showing that the court abused its discretion. *Alexander, supra; Ohio Turnpike Comm. v. Ellis* (1955), 164 Ohio St. 377, 58 O.O. 179, 131 N.E.2d 397. An abuse of discretion " 'connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482–483, 450 N.E.2d 1140, 1142, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144.

---

**1.** We note that R.C. 2743.43, which delineates those competent to give expert testimony on liability issues in a medical claim, requires that the person testifying devote three-fourths of his professional time to the active clinical practice of medicine or surgery.

■ A review of Manthey's voir dire testimony reveals that he is licensed in the state of Ohio to practice medicine and surgery. For over thirty years, Manthey has been a general practitioner.

During voir dire, Manthey testified that he was trained in medical school on how to perform a herniorrhaphy. Although Manthey testified that he has never performed a modified Bassini herniorrhaphy procedure, he gave the following testimony concerning his familiarity with that procedure:

"A: Basically most men that I have assisted, in the last 35 years, have been using the Bassini procedure or what is called the Bassini/McVay, a modification of how you suture tendons. I see very few men using the old standard Halsted procedure any more.

"Q: You mentioned a modification of the Bassini/McVay. What is the primary difference in the approach?

"A: I think basically it is how you close your hernia and in respect to which tendons you use to close with.

"Q: Now, although you have not performed any herniorrhaphies yourself since 1959, have you remained familiar with the surgical procedures involved?

"A: Yes, I have.

"Q: And how have you done that?

"A: By assisting on herniorrhaphies.

"Q: And assisting on other surgeries?

"A: Yes, sir.

"Q: And how many hernia surgeries or herniorrhaphy surgeries have you assisted in since you performed them yourself?

"A: I would say a minimum of three to four hundred.

"Q: And have you remained up to date on literature and things like that?

"A: Not especially, no.

"Q: Now, you mentioned you are not privileged to practice major surgery in any of the local hospitals. Why are you not privileged?

"A: I never asked for the privilege in general surgery.

"Q: But you are licensed by the State of Ohio to perform that surgery?

"A: Yes, I am.

" * * *

"Q: And based upon all of that, do you feel that you are familiar enough with the procedures involved in the surgery procedure of herniorrhaphies and the

various approaches to the procedure including the modifications to the straight Bassini herniorrhaphy to render opinions as to how that procedure should be performed?

"A: Yes, I do."

When further questioned about his assistance in herniorrhaphy surgeries, Manthey testified as follows:

"Q: You talked about assisting the surgeon, is that for an inguinal hernia repair?

"A: Yes.

"Q: As assistant, you do not operate in that field of operation—you don't touch the hernia; do you?

"A: Yes, I do.

"Q: You retract the tissue; isn't that what you do?

"A: I also touch the hernia by putting a finger on it and pull it out.

"Q: Are you the one that does the sutures in and around the inguinal ring?

"A: I do most of the tying, yes.

" * * *

"Q: When you assisted in the various surgeries, three or four hundred you mentioned, did you actively participate in the surgery itself?

"A: I certainly did.

"Q: Give us some examples of how you might do that?

"A: For instance, when he opened up, ligation of the bleeders, I usually do the tying of them; held the hemostats if he cauterizes them. Sometimes I would retract the cord for him and when the hernia sac is pealed away from the spermatic cord, I would usually grab the end of it and hold it and help open it up so the surgeon could put a finger in there and retract it. I would retract also when he started to make the closures, and most of the time I tie the sutures after placed by the surgeon.

" * * *

"Q: All right. Without going into—Well, at this point doctor, the deepest layer of the operation in the herniorrhaphy that is having to do with the muscles around the internal ring, closing up after the hernia had been repaired, have you participated in that phase of the surgery?

"A: Assisting the surgeon, yes.

"Q: How did you assist the surgeon in that way?

"A: Usually by retraction. I would grab the needle to stabilize it and the surgeon would regrab it and go to the opposite side. And then after the surgeon placed the sutures in there, I did the tying and cutting of the sutures.

"Q: How about with respect to the closure of the internal ring, did you have any—have you ever had any participation in that phase of the operation?

"A: Many times the surgeon will ask you if you feel it is, too tight and you place your small finger into the hernia, the internal ring, to see what you think: how close or how tight it is.

"Q: These things you have actually done in the assistance of the performing general surgeon with a herniorrhaphy?

"A: Yes."

In light of the foregoing, we find that Manthey demonstrated sufficient familiarity with the procedure performed by Buxton to be qualified to testify as an expert. The value of his testimony is then a matter of weight and credibility for the jury. Therefore, we must conclude that the trial court abused its discretion in holding that Manthey was not qualified to testify as an expert medical witness in this case.

As the trial court stated in its judgment entry dated September 30, 1993, summary judgment was predicated upon the exclusion of Manthey's expert testimony. Thus, for the foregoing reasons, the trial court erred in granting summary judgment in favor of Buxton.

Accordingly, appellant's assignments of error are well taken. The judgment of the common pleas court is reversed and this cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

THOMAS F. BRYANT and EVANS, JJ., concur.