2006 OK 39

**Stephen GAINES, Appellant,**

v.

**COMANCHE COUNTY MEDICAL HOSPITAL and Nursefinders, Inc., Appellees.**

**No. 100,598.**

Supreme Court of Oklahoma.

June 13, 2006.

As Corrected June 20, 2006.

Rehearing Denied Sept. 11, 2006.

Mike Markey, Wichita Falls, TX, for appellant, Stephen Gaines.

Inona Jane Harness, Leslie D. Guajardo, Pierce Couch Hendrickson Baysinger & Green, L.L.P., Oklahoma City, OK, for appellee, Comanche County Memorial Hospital.

Monty B. Bottom, Jason T. Rogers, Foliart, Huff, Ottoway & Bottom, Oklahoma City, OK, for appellee, Nursefinders, Inc.

Stephen Peterson, Michael McMillin, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, OK, for amici curiae, Oklahoma State Medical Association & Oklahoma Hospital Association.

WATT, C.J.

¶ 1 The cause presents a question of first impression in Oklahoma law: whether a registered nurse—with eighteen years of experience, who is familiar with the standards of nursing care for the elderly and critically ill and who has a certification for wound care— may offer expert testimony concerning the practices of other nurses and the standard of care in the avoidance, treatment and cause of bedsores. Under the facts presented, we determine that the registered nurse's expertise makes her qualified to give such expert testimony and express her opinion.

¶ 2 In allowing the nurse-expert's testimony as to the practices of other nurses, we align Oklahoma jurisprudence with all other jurisdictions considering whether a nurse may offer expert opinion testimony concerning decubitus ulcers.[1] Our determination is also consistent with the legislative directive in *12 O.S.2001 2702*[2] providing that witnesses may qualify as experts "by knowledge, skill, experience, training or education."

¶ 3 The second question requires that we consider whether a material issue of fact exists militating against the entrance of summary judgment. Here, the only physician testimony contained in the record indicates that the doctor does not consider himself an expert on decubitus ulcers.[3] In contrast, the patient's nurse expert has eighteen years of experience, is familiar with the standard of nursing care for the elderly and critically ill and is certified for wound care practice. Furthermore, her affidavit provides that: 1) the standard of care for the critically ill patient was not carried out by the hospital's nurses; 2) the failure to reposition the patient was a direct contributor to the development of severe decubitus ulcers; 3) the nurses failed to meet the standard of care when they did not place heel protectors on Gaines' heels or feet and that this negligence was a direct and foreseeable cause of the development of decubitus ulcers; and 4) the decubitus ulcers could have been avoided if the standard of care had been followed.[4]

¶ 4 When presented with the review of summary judgment, all inferences and conclusions to be drawn from the underlying facts contained in the record are considered in the light most favorable to the patient.[5] Summary judgment is improper if, under the evidentiary materials, reasonable individuals could reach different factual conclusions.[6] We are constrained to reverse summary judgment when it appears there are disputed facts.[7]

¶ 5 Here, genuine issues of material fact exist concerning whether the patient received appropriate treatment and, if not, whether the patient's bedsores were avoidable. Therefore, we determine that the judgment should be reversed and the cause remanded for a resolution of these issues by the trier of fact.

## RELEVANT FACTS

¶ 6 On December 1, 2000, following injuries from multiple gunshot wounds, the appellant, Stephen Gaines (Gaines/patient), was admitted to Comanche County Memorial Hospital (hospital), an appellee herein. **Gaines was a large man, approximately six feet four inches tall and weighing three hundred and eighty pounds.** Following his initial surgery, Gaines suffered two abdominal eviscerations requiring surgical repair. The repairing physician, Kelly Means, M.D. (Means), instructed that Gaines not be moved

1. See ¶ 12 and accompanying footnotes, infra.

2. Title *12 O.S.2001 2702* provides in pertinent part:
 "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise."

3. See, ¶ 22 and accompanying footnotes, infra.

4. See, ¶ 23 and accompanying footnotes, infra.

5. *Mitchell v. Cox, 1997 OK 139*, ¶ 7, *948 P.2d 317.*

6. *Barnthouse v. City of Edmond, 2003 OK 42*, ¶ 36, 73 P.3d 840.

7. *Travel Stop, Inc. v. Alliance General Ins. Co., 1997 OK 138*, ¶ 7, *950 P.2d 834; Seitsinger v. Dockum Pontiac, Inc., 1995 OK 29*, ¶ 7, *894 P.2d 1077.*

for forty-eight hours following the second procedure.

¶ 7 Gaines left the Hospital on January 17, 2001, when he was transferred to another facility. Before his transfer and while in the hospital, Gaines developed bedsores on his sacral area, feet, heels and head.

¶ 8 The doctor who was originally a defendant in the cause testified that he did not consider himself any kind of an expert on bedsores and that he would find it difficult to identify the stage of the ulcers.[8] The nurse's affidavit offered as plaintiff's evidentiary material provides that: 1) the standard of care for the critically ill patient was not carried out by the hospital's nurses; 2) *the failure to reposition the patient was a direct contributor to the development of severe decubitus ulcers*; 3) the nurses failed to meet the standard of care when they did not place heel protectors on Gaines' heels or feet and that this negligence was a direct and foreseeable cause of the development of decubitus ulcers; and 4) the decubitus ulcers could have been avoided if the standard of care had been followed.[9]

¶ 9 The patient filed a malpractice suit against Means, the hospital and the appellee, Nursefinders, Inc. (Nursefinders), in October of 2002. Subsequently, **the doctor was dismissed from the malpractice cause** leaving only the hospital and Nursefinders as defendants. The hospital and Nursefinders filed a motion for summary judgment on February 17, 2004, **on grounds that Gaines had not come forward with any expert physician testimony to support his malpractice claims.** Gaines opposed the motion and requested additional time to provide a more detailed vitae on the nurse's qualifications.

8. See ¶ 22 and accompanying footnotes, infra.

9. See, ¶ 23 and accompanying footnotes, infra.

10. Our holding today is narrow. We determine merely that, under the facts presented—where the doctor admitted that he was "no expert" on decubitus ulcers and where the nurse is certified in wound care and has extensive experience in the care of the critically ill and elderly—the nurse may testify as to the standard of care afforded by other nurses. The dissent's assertions that the majority decision is an anathema because there is no supporting Oklahoma authority or extant jurisprudence to support the determination cannot go unanswered.

Nevertheless, on April 1, 2004, the trial court sustained the motion. Recognizing the management of pressure sores is the responsibility of nurses, the Court of Civil Appeals reversed.

## DISCUSSION

¶ 10 **a. The registered nurse's expertise makes her an appropriate professional to offer expert testimony concerning the practices of other nurses and the standard of care in the avoidance, treatment and cause of bedsores.**

█ ¶ 11 The patient argues that a registered nurse with the experience of his nurse-expert should be allowed to offer an expert opinion as to the practices of other nurses and the standards of care in the avoidance, treatment and cause of bedsores. The hospital and Nursefinders assert that the nurse is not qualified to give an expert opinion in a medical malpractice action. Their assertion is supported by the *amici curiae,* Oklahoma State Medical Association and the Oklahoma Hospital Association (collectively, Associations), who submitted their statement in support of granting certiorari. We disagree with the hospital, Nursefinders and the Associations.

█ ¶ 12 It is a rarity when all courts addressing any particular question are in agreement. Nevertheless, our research reveals that, in all causes in which the issue of a nurse's expert testimony arose in response to inquiries concerning a patient's development of and the treatment for bedsores, all jurisdictions having addressed the issue allow the testimony.[10]

We agree with the dissent that there is no Oklahoma authority for our decision—that is the nature of an issue of first impression. Nevertheless, the fact that the dissent concedes that to adopt its position would leave Oklahoma jurisprudence as "a minority of one" cannot be reconciled with its statement that there is no extant jurisprudence to support today's holding. The only jurisprudence addressing the issue of the ability of nurses to testify as to the standard of care necessary to avoid bedsores supports the determination of the majority opinion.

We recognize that there are differences between nurses and doctors except to the extent that, under the facts presented, the doctor admits

¶ 13 The Kansas Court did so in *Mellies v. National Heritage*, 6 Kan.App.2d 910, 636 P.2d 215 (1981). *Mellies* shares two important and persuasive factors with this cause. In *Mellies*, the testimony was offered by nurses who had special training in wound care. Here, the nurse had eighteen years of experience, worked in an area where she treated the elderly and critically ill and was certified for wound care practice. In *Mellies*, the testimony was offered to demonstrate the negligence of the nursing staff. Here, after the physician had been dismissed from the cause, the nurse's testimony was offered as evidence of substandard care administered by the hospital's staff.

¶ 14 The *Mellies* Court concluded that the trial judge abused his discretion in disallow-

ing the nurse's testimony as expert on decubitus ulcers. It concluded that, with the proper foundation, **nurses should be qualified as experts as to causation and as to treatment and cure of bedsores.** In doing so, it recognized that such skin eruptions are "primarily a nursing problem ... nurses are experts ...".

¶ 15 *Mellies* represents the position taken by all deciding tribunals concerning nurse-expert testimony in relation to bedsores.[11] **Research reveals no decision, turning on the issue of whether a nurse may offer expert testimony relating to bedsores, which has disallowed such evidence.**

¶ 16 The Kansas Court's stance is consis-

that he is incompetent to testify as an expert on bedsores. Furthermore, we will not act as fact finders, as the minority urges. The dissent looks to the facts and determines that, because the doctor does not believe nurse malpractice caused the decubitus ulcers, this cause should not be returned to the trial court. On an appeal of summary judgment, this Court does not act as fact finder—that is left to the province of either the jury or the trial judge sitting as such. Our holding simply demonstrates this well recognized principle.

Today's decision cannot be determined to have "opened the floodgates" for nurses to testify as experts in malpractice causes brought against physicians. It is limited to its facts and expresses no opinion on whether the patient should prevail. Nevertheless, it is abundantly clear that other jurisdictions have allowed nurses to testify as experts in an ever increasing number of causes. Another example of "extant jurisprudence" supporting the majority.

The following jurisdictions hold, as do we, that nurses may offer expert testimony concerning the development or prevention of decubitus ulcers. *Lawson v. Dallas County*, 112 F.Supp.2d 616, 621 (D.C.Tex.2000), *aff'd*, 286 F.3d 257 (5th Cir. 2002) [Nurse jailor was qualified to give expert testimony regarding a prisoner's development of decubitus ulcers in § 1983 action.]; *State v. Bermisa*, 104 Hawai'i 387, 90 P.3d 1256, 1264–65 (2004) [Nurses are trained to know that patients are at risk for decubitus and infection. Nurse's training, observations and personal knowledge all contribute to the ability to offer an expert opinion.]; *Thomas v. Greenview Hosp., Inc.*, 127 S.W.3d 663, 672 (Ky.App.2004) [Registered nurse qualified to testify as an expert on the breach of the standard of care by nursing staff in regards to treatment of pressure ulcer. Overruled on other grounds.]; *Estate of Youngblood v. Halifax Convalescent Center, Ltd.*, 874 So.2d 596, 601 (Fla.App.2004), *rehearing denied* (2004), *re-*

*view dismissed*, 912 So.2d 1217 (Fla.2005) [Nurse was qualified to testify on overall care afforded patient who developed pressure sores. Abrogated on other grounds.]; *Harlett v. St. Vincent Hosps. & Health Servs.*, 748 N.E.2d 921, 924 (Ind.App.2001), *transfer denied*, 761 N.E.2d 422 (2001) [Nurses, as health care providers, were qualified under the Medical Malpractice Act to serve on a medical review panel appointed in medical malpractice claim against hospital after patient developed bedsores.]; *State v. Boone Retirement Center, Inc.*, 26 S.W.3d 265, 274–5 (Mo. App.2000), *rehearing/transfer denied* (2000), *transfer denied* (2000) [Nurse who had worked in the nursing field for fifteen years qualified to give testimony concerning bedsores. Left to jury to determine the weight of that evidence.]; *Brown v. DeKalb Medical Center*, 225 Ga.App. 4, 482 S.E.2d 511–12, *cert. denied* (1997) [In absence of any objection, nurse was qualified to testify as to cause of development of pressure sores.]; *Parris v. Uni Med. Inc.*, 861 S.W.2d 694, 697–98 (Mo. App.1993), *rehearing/transfer denied* (1993), *transfer denied* (1993) [Nurses were qualified to give expert testimony regarding bedsores, their cause and treatment.]; *Mellies v. National Heritage, Inc.*, 6 Kan.App.2d 910, 636 P.2d 215, 222 (1981) [A nurse, who has had wide experience with bedsores is, in fact, an expert as to decubitus ulcers since their prevention, treatment and cure are largely nursing duties.].

11. *Lawson v. Dallas County*, see note 10, supra; *State v. Bermisa*, see note 10, supra; *Thomas v. Greenview Hosp., Inc.*, see note 10, supra; *Estate of Youngblood v. Halifax Convalescent Center, Ltd.*, see note 10, supra; *Harlett v. St. Vincent Hosps. & Health Servs.*, see note 10, supra; *State v. Boone Retirement Center, Inc.*, see note 10, supra; *Brown v. DeKalb Medical Center*, see note 10, supra; *Parris v. Uni Med. Inc.*, see note 10, supra; *Mellies v. National Heritage, Inc.*, see note 10, supra.

tent with *12 O.S.2001 2702's*[12] legislative directive providing that witnesses may qualify as experts "by knowledge, skill, experience, training or education." Also instructive on the impact of the statute on nurse-expert testimony is *Grover v. Isom*, 137 Idaho 770, 53 P.3d 821, *rehearing denied* (2002).

¶ 17 In *Grover*, the Idaho Supreme Court considered the impact a statute similar to § 2702[13] had on recognition of an individual as an "expert." The *Grover* Court determined that a certified registered nurse anesthesiologist with twenty years of experience was qualified to give expert testimony in a patient's action against an oral surgeon. The Idaho Court found it immaterial that the nurse had never administered anesthesia in an oral surgeon's office.

 ¶ 18 Here, the registered nurse has almost twenty years of experience. She is a specialist in wound care nursing and she has practiced with patients who are prone to develop decubitus ulcers—the elderly and critically ill. She is qualified as an expert

witness under *12 O.S.2001 2702*[14] by her knowledge, her skill, her experience, her training and her education.[15]

¶ 19 This cause presents unique facts—a nurse offering her expertise as a standard from which to judge the standard of care of other nurses in a restricted and specific area, the care, treatment and avoidance of bedsores. Under the unique facts presented, we determine a registered nurse—with eighteen years of experience, who is familiar with the standards of nursing care for the elderly and critically ill and who has a certification for wound care practice—may offer expert testimony concerning the practices of other nurses and the standards of care in the avoidance, care, prevention and origin of bedsores. In so doing, **we emphasize that this cause does not present the issue of whether a nurse would be an appropriate expert witness in a malpractice cause filed against a physician.** We also express no opinion on what appears to be a trend towards allowing a nurse's testimony to be treated as expert in an ever increasing number of arenas.[16] To

---

12. Title *12 O.S.2001 2702,* see note 2, supra.

13. Idaho Rule of Evidence 702 provides:
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

14. Title *12 O.S.2001 2702,* see note 2, supra.

15. An expert need not have a formal degree to appear and give testimony as an "expert" where training and experience are sufficient to identify the individual as an expert. *State v. Billiot*, 672 So.2d 361, 373 (La.App.1996), *writ denied*, 680 So.2d 655 (La.1996). Properly qualified individuals, though not physicians, may be sworn as a medical expert. *People v. Scala*, 128 Misc.2d 831, 491 N.Y.S.2d 555, 560–61 (1985).

16. See, *United States v. Noda*, 137 Fed.Appx. 856, 863 (6th Cir.2005) [Pediatric nurse practitioner well qualified to give expert testimony regarding ages of children depicted in pornography.]; *Griel v. Franklin Medical Center*, 71 F.Supp.2d 1, 9, *aff'd*, 234 F.3d 731 (1st Cir.2000) [Acute care nurses qualified to give expert testimony regarding standard of care of nurses distributing drugs.]; *Garcia v. Columbia Medical Center of Sherman*, 996 F.Supp. 617, 625 (D.C.Tex.1998) [Although nurse could not give testimony against physicians on standard of care,

she would be considered an expert in giving opinion on fellow nurses' actions.]; *Broehm v. Mayo Clinic Rochester*, 690 N.W.2d 721, 726 (Minn.2005) [Certified geriatric nurse practitioner had sufficient training or practical experience to offer opinion, for purposes of patient's expert witness pretrial disclosure, that hospital breached nursing standard of care.]; *Grover v. Isom*, 137 Idaho 770, 53 P.3d 821, 825 (2002), *rehearing denied* (2002) [Nurse who had administered anesthesia qualified to testify in case against dentist although he had never administered anesthesia in an office.]; *Velazquez v. Commonwealth*, 263 Va. 95, 557 S.E.2d 213, 218 (2002) [Nurse qualified to testify as an expert regarding her medical opinion on causation of alleged victim's injuries—statutes governing practice of medicine would not prohibit testimony as constituting the practice of medicine.]; *In re Elba General Hosp. & Nursing Home, Inc.*, 828 So.2d 308, 312 (Ala. 2001) [Use of nurse's affidavit not so prejudicial as to require its striking on appeal.]; *Creasy v. Rusk*, 730 N.E.2d 659, 669 (Ind.2000) [Licensed practical nurse was qualified to give expert testimony concerning patient's mental state.]; *HealthTrust, Inc. v. Cantrell*, 689 So.2d 822 (Ala. 1997) [Registered nurse qualified to testify as expert concerning standard of care alleged to have been breached by operating room technician.]; *Carolan v. Hill*, 553 N.W.2d 882 (Iowa 1996) [Exclusion of nurse-anesthetist's testimony as to standard of care was prejudicial error.]; *Medical Center of Delaware, Inc. v. Lougheed*, 661 A.2d 1055, 1058 (Del.1995) [Nurse was qualified

to testify as expert witness in medical malpractice action asserting that hospital's employee deviated from applicable standard of care.]; *Harris v. Miller*, 335 N.C. 379, 438 S.E.2d 731, 741 (1994) [Nurse qualified to give testimony against physician who had been negligent in supervising anesthetist.]; *Koeniguer v. Eckrich*, 422 N.W.2d 600 (S.D.1988) [Head of nursing qualified to testify that it is for nurses to determine, on change of condition for the worse, whether doctor's orders of dismissal should be followed.]; *Avret v. McCormick*, 246 Ga. 401, 271 S.E.2d 832 (1980) [Nurse qualified to testify against physician as to standards of care in keeping sterile a needle used to draw blood.]; *Morris v. State*, 268 Ga.App. 325, 601 S.E.2d 804, 806 (2004), *cert. denied*, 543 U.S. 1075, 125 S.Ct. 925, 160 L.Ed.2d 813 (2005) [Pediatric nurse was qualified to provide expert testimony in child abuse case.]; *State v. One Marlin Rifle*, 319 N.J.Super. 359, 725 A.2d 144, 147 (1999) [Indicating that nurse might qualify to give expert testimony if evidence had disclosed the length of time she had worked in the field.]; *People v. E.H.*, 837 P.2d 284, 288 (Colo.App.1992), *cert. denied* (1992) [Nurse qualified to offer expert testimony concerning mother's parenting deficits and issue of termination of parental rights.]; *State v. Serebin*, 119 Wis.2d 837, 350 N.W.2d 65, 72–3 (1984) [Nurses' testimony on standard of care sufficient to support nursing home administrator's conviction for abuse of inmates of an institution.]; *SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 240–41 (Tex.App.2005) [Nurse was qualified to testify as an expert on standard of care where patient was injured in a wheelchair fall while not being supervised.]; *People v. Carroll*, 300 A.D.2d 911, 753 N.Y.S.2d 148, 151 (2002), *appeal denied*, 99 N.Y.2d 626, 760 N.Y.S.2d 107, 790 N.E.2d 281 (2003) [Nurse's testimony that there were hymenal tears which could have been caused by digital penetration constituted proof of the crime charged.]; *Wiley v. Henry Ford Cottage Hosp.*, 257 Mich.App. 488, 668 N.W.2d 402 (2003), *special panel not convened*, 257 Mich. App. 801, 668 N.W.2d 641(2003), *appeal denied*, 469 Mich. 1019, 678 N.W.2d 439 (2004) [Nurse qualified to testify as to whether actions of other nurses in causing laceration to patient later resulted in amputation of leg.]; *Theatre Management Group, Inc. v. Dalgliesh*, 765 A.2d 986, 992 (D.C.App.2001) [Nurse qualified to give expert testimony about wheelchair-related items, in-home aide, physical therapy, counseling, and medications that patron would need.]; *Gregory v. State*, 56 S.W.3d 164, 177 (Tex.App.2001) [Nurse who conducted genital examination of child was qualified to testify as an expert in trial for indecency with a child, even though she was precluded from making a medical diagnosis or otherwise practicing medicine.]; *White v. DePuy, Inc.*, 129 Ohio App.3d 472, 718 N.E.2d 450, 459 (1998) [Indicating that with proper foundation and experience, a nurse might be qualified as an expert witness.]; *St. Elizabeth Hospital v. Graham*, 883 S.W.2d 433, 441 (Tex.App.1994), *rehearing overruled* (1995), *writ denied* (1995), *rehearing of writ of error denied* (1995) [Nurses could testify as expert concerning severity of fall and injury of patient while hospitalized.]; *Berdyck v. Shinde*, 1993 Ohio 183, 66 Ohio St.3d 573, 613 N.E.2d 1014 (1993) [Nurse qualified to testify that pregnant patient should have been observed because of possibility of seizure considering her physical condition.]; *Gray v. Jefferson Geriatric & Rehabilitation Center*, 76 Ohio App.3d 499, 602 N.E.2d 396, 399 (1991) [Nurse qualified to give testimony against hospital for negligence of its nurse—not qualified to give testimony against physician or hospital for medical malpractice.]; *Holland v. Riverside Methodist Hospital*, 70 Ohio App.3d 112, 590 N.E.2d 430, 433 (1990), *jurisdictional motion overruled*, 59 Ohio St.3d 701, 571 N.E.2d 134 (1991) [Although nurse would have been competent to testify as to standards of nursing care, she offered no opinion on subject.]; *Fountain v. Cobb General Hospital*, 167 Ga.App. 36, 306 S.E.2d 37, 38–40 (1983) [Nurse was qualified to express an expert opinion as to administration of anesthesia or when an epidural catheter should be removed.]; *McCormick v. Avret*, 154 Ga.App. 178, 267 S.E.2d 759–60 (1980), *aff'd*, 246 Ga. 401, 271 S.E.2d 832 (1980) [Nurse qualified to provide expert testimony as to that which constituted reasonable care in keeping needle sterilized.]; *Walter v. Pence*, 104 Ind.App. 532, 12 N.E.2d 367–68 (1938) [Nurse was qualified to give expert testimony on value of hospital services.]; *Texas Employers' Ins. Ass'n v. Drews*, 297 S.W. 630, 632 (1927) [Nurse, who had attended cases of erysipelas but not practiced profession for five years, qualified to give expert testimony.]. See also, "The Nursing Profession in the 1990's: Negligence and Malpractice Liability," 43 Clev.St.L.Rev. 557 (1995) [Physician may not be qualified, in all instances, to testify as to nurses' standards of care.]; *R. Hills*, "*Hewitt v. Kalish: Qualifying as an 'Expert' Under O.C.G.A. SECTION 9–11–9.1*," 1995 Mercer L.R. 1537; Note, "Expert Witnesses in Malpractice Cases Against Nps," 2 Health Matrix 325 (1992) [The trend is to recognize that nurses have knowledge peculiar to nursing and to use nurses as expert witnesses in malpractice cases against nurses.].

But see, *Elswick v. Pikeville United Methodist Hospital of Kentucky, Inc.*, 50 Fed.Appx. 193–94 (6th Cir.2002) [Finding that nurse not qualified to present expert testimony as to cause of staph infection not clearly erroneous where nurse denied having expertise to give opinion.]; *Green v. Charleston Area Medical Center, Inc.*, 215 W.Va. 628, 600 S.E.2d 340, 344 [Nurse could not present expert testimony on an area outside her expertise.]; *Crocker v. Paulyne's Nursing Home, Inc.*, 95 S.W.3d 416, 421 (Tex.App.2002), *rehearing overruled* (2003) [Summary judgment affidavits insufficient to establish that nurses were qualified to give expert testimony.]; *Stryczek v. Methodist Hosps., Inc.*, 694 N.E.2d 1186, 1190 (Ind.App.1998), *transfer denied*, 706 N.E.2d 172 (Ind.1998) [Nurse not qualified to offer expert testimony on standards of care for physician in action against hospital where patient received radiation treatment and chemotherapy.]; *Taplin v. Lupin*, 700 So.2d 1160, 1162 (La.App.1997)

hold otherwise would place Oklahoma in the position of being a minority of one on the issue of nurse-expert testimony relating to decubitus ulcers and require us to ignore the clear legislative mandate of *12 O.S.2001 2702.*[17]

¶ 20 **b. The existence of material fact issues concerning whether the patient received appropriate treatment and, if not, whether the patient's bedsores were avoidable requires that the cause be reversed and remanded for a resolution of these issues by the trier of fact.**

 ¶ 21 Summary judgment is proper only when the pleadings, affidavits, depositions, admissions or other evidentiary material establish that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.[18] All evidentiary materials submitted to the trial court are viewed in the light most favorable to the party opposing the motion.[19] Even when the basic facts are undisputed, *motions for summary judgment should be denied, if under the evidence, reasonable persons might draw different inferences from the undisputed facts.*[20]

¶ 22 Here, neither the hospital nor Nursefinders presented any expert testimony indicating that only a doctor is qualified to testify concerning the practices of nurses and the standards of care in the prevention, avoidance, care and cause of bedsores. They did not provide an affidavit from an individual on the nursing staff stating that Gaines received the kind of care which normally would avoid the forming of decubitus ulcers. Furthermore, statements by Means and the patient's nurse-expert, Susan Fuller (Fuller/nurse), on their relative experiences with decubitus ulcers were markedly different. **When the doctor was questioned about his experience with decubitus ulcers, he stated that he did not consider himself any kind of an expert on bedsores and that he would find it difficult to identify the stage of the ulcers.**[21]

¶ 23 In contrast, the nurse outlined her qualifications arising from eighteen years of nursing practice, her certification for wound care and her knowledge of the standard of care for nurses to critically ill and/or bedridden patients. Based on her training and experience, the nurse stated in an affidavit signed on February 24, 2004, that: 1) the standard of care for a critically ill patient was not carried out by the Hospital's nurses—Gaines' chart revealed that the nurses did not turn him every two hours as is standard practice to avoid bedsores either before the time his doctor ordered him not to be moved for forty-eight hours or following the rescission of that order; 2) the failure to reposition the patient in required intervals was a direct contributor to the development of severe decubitus ulcers on Gaines' coccyx, heels and head region; 3) the nurses failed to meet the

---

17. Title *12 O.S.2001 2702*, see note 2, supra.

18. *Sullivan v. Buckhorn Ranch Partnership, 2005 OK 41, ¶ 23, 119 P.3d 192; Bogart v. CapRock Communications Corp., 2003 OK 38, ¶ 20, 69 P.3d 266; Prichard v. City of Oklahoma City, 1999 OK 5, ¶ 19, 975 P.2d 914.*

[Registered nurse not qualified to give expert testimony as to whether emergency room physician certified in internal medicine breached applicable standard of care.]; *Waatti v. Marquette General Hospital, Inc.,* 122 Mich.App. 44, 329 N.W.2d 526 (1983) [Nurse's testimony did not establish requisite standard of care of emergency room treatment.]; *Saliba v. Uniontown Hosp.,* 54 Pa. D. & C.4th 202 (2001) [Registered nurse not qualified to testify as expert with regard to whether emergency room physicians deviated from good and acceptable medical standards in diagnosing and treating plaintiff's baby daughter.].

19. *Green v. Harris, 2003 OK 55, ¶ 11, 70 P.3d 866; K & K Food Services, Inc. v. S & H, Inc., 2000 OK 31, ¶ 16, 3 P.3d 705; Phelps v. Hotel Management, Inc., 1996 OK 114, ¶ 7, 925 P.2d 891.*

20. *Carris v. John R. Thomas & Associates, 1995 OK 33, ¶ 16, 896 P.2d 522.*

21. Deposition of Kelly Means, M.D. taken on December 3, 2003, providing in pertinent part at p. 45:

"... Q. Okay. Is it possible to identify, by looking at a decubitus ulcer, what the stage of it is?
A. It's difficult.
Q. Could you do it?
A. I'm not an expert at it but I could—
Q. You don't consider yourself an expert on decubitus ulcers?
A. No. By no means, no ...."

standards of care when they did not place heel protectors on Gaines' heels or feet and that this negligence was a direct and foreseeable cause of the development of decubitus ulcers; and 4) Gaines' development of decubitus ulcers could have been avoided if the standards of care had been followed despite his weight, any nutritional deficits, and/or immobility due to trauma and surgical complications.

¶ 24 **The evidentiary materials reveal material questions of fact as to whether Gaines received appropriate care for the prevention and treatment of bedsores.** The registered nurse's testimony regarding the patient's handling by the hospital and Nursefinders might be sufficient for a trier of fact to determine that the care, or lack thereof, that Gaines received caused his decubitus ulcers. The trier of fact might be even more inclined to rule in the patient's favor if, as here, there were no evidence to contradict the nurse-expert's opinion.

¶ 25 Although we express no opinion on whether Gaines will or should prevail, all inferences and conclusions to be drawn from the underlying facts favor the patient.[22] Therefore, we must reverse summary judgment.[23] Because genuine issues of material fact exist concerning whether the patient received appropriate treatment and, if not, whether the patient's bedsores were avoidable, we determine that judgment by summary process should be reversed and the cause remanded for a resolution of these issues by the trier of fact.

## CONCLUSION

¶ 26 This case does not involve a situation where a nurse is giving expert testimony against a physician. **The doctor has been dismissed from the cause and the only remaining defendants are the hospital and Nursefinders.** The nurse's affidavit attached to the motion for summary judgment gave expert testimony based on her training and experience while **the doctor stated that he would have difficulty identifying what stage a bedsore was in and that he would not consider himself any kind of expert on such wounds.**[24]

¶ 27 Under the facts presented, we determine that the registered nurse's expertise qualifies her for expert testimony on the issue of bedsores, their cause, treatment and avoidance. In so holding, we align Oklahoma jurisprudence with all other jurisdictions that have considered whether a nurse may offer expert opinion testimony concerning development or prevention of decubitus ulcers.[25] Our determination is also consistent with the legislative directive in *12 O.S.2001 2702*[26] providing that expert witnesses may qualify as experts "by knowledge, skill, experience, training or education."

¶ 28 The cause presents disputed issues of material fact concerning whether the patient received appropriate treatment and, if not, whether the patient's bedsores were avoidable. Considering all the available evidentiary material in favor of the patient submitted in summary process, we determine that summary judgment should be reversed and the cause remanded for a resolution of these issues by the trier of fact. CERTIORARI GRANTED.

**COURT OF CIVIL APPEALS OPINION VACATED; REVERSED AND REMANDED.**

WATT, C.J., LAVENDER, OPALA, EDMONDSON, COLBERT, JJ., concur.

HARGRAVE, J., concurs in result.

WINCHESTER, V.C.J., TAYLOR, J., JOHNSON, S.J., dissent.

KAUGER, J., recused.

OPALA, J., with whom WATT, C.J., and COLBERT, J., join, concurring.

¶ 1 The court *reverses* today a summary judgment for the defendants, *declares* a

22. *Mitchell v. Cox,* see note 5, supra.

23. *Travel Stop, Inc. v. Alliance General Ins. Co.,* see note 7, supra; *Seitsinger v. Dockum Pontiac, Inc.,* see note 7, supra.

24. See ¶¶ 22–3 and accompanying footnotes, supra.

25. See ¶ 12 and accompanying footnotes, supra.

26. Title *12 O.S.2001 2702,* see note 2, supra.

nurse's affidavit does provide an evidentiary substitute with an acceptable expert opinion on the etiology of decubitus ulcers, and *remands* the cause for trial of disputed fact issues.

¶2 Although I concur in the court's pronouncement, I write separately to articulate some of the reasons that impel me to the court's view.

## I

## THE ROOTS OF A REGISTERED NURSE'S EXPERTISE IN THE ETIOLOGY OF DECUBITUS ULCERS

### A.

### *Training, Education and Experience*

¶3 A registered nurse may be qualified by education, training and experience to give expert opinion testimony on the etiology of decubitus ulcers.[1] Nothing in the evidentiary materials impels a conclusion to the contrary. This is so because the nurse's affidavit in the summary record shows in concrete terms that by training, education and experience she was familiar with the plaintiff's injury and its causation.[2]

### B

### *Nursing Standards of Care Are Private Standards That Encapsulate Medical Etiology*

¶4 The nurse's affidavit invokes and incorporates private professional standards of nursing care[3] which confirm an etiological link between substandard patient positioning and the development of decubitus ulcers. The etiology which she relies on—a causative link of decubitus ulcers to substandard pa-

1. *See, e.g., Mellies v. National Heritage, Inc.,* 6 Kan.App.2d 910, 636 P.2d 215, 222–23 (1981); *State v. Bernisa,* 104 Hawai'i 387, 90 P.3d 1256, 1264–65 (App.2004).

2. The nurse's affidavit states in pertinent part:

 "... I have a degree in nursing which I obtained from Cameron University in Lawton, Oklahoma in 1982. My license is in good standing in the State of Oklahoma. I am certified in wound care. I am familiar with the standard of care for providing nursing care to critically ill and or bedridden patients. I currently practice in the field of nursing, providing care to patients in the Intensive Care Unit at Southwestern Medical Center in Lawton, Oklahoma...."

3. The nurse's affidavit states in pertinent part:

 "... The **standard of care** for a critically ill patient such as Stephen Gaines is that the patient must be turned and or repositioned every two hours. This was not done by the nurses at Comanche County Memorial Hospital assigned to care for Stephen Gaines ... Additionally, the **standard of care** was not met by the nurses ... because they did not place heel protectors on Stephen Gaines. The failure to place the heel protectors was a direct and foreseeable consequence and cause of the development of decubitus ulcers on Stephens Gaines's feet and heels.... As a direct result of the failure of the nurses ... to meet the **standard of care,** Stephen Gaines developed severe decubitus ulcers on his coccyx, heels and possibly head region...."
 (emphasis added).

Private standards are those promulgated by a profession or industry. Private standards-making organizations, which have no mandatory powers, establish standards by "general consent" of industry or trade. Marian P. Opala, *The Anatomy Of Private Standards–Making Process: The Operating Procedures Of The USA Standards Institute,* 22 Okl.L.Rev. 45, 46 (1969). In Frank J. Cavico and Nancy M. Cavico, *The Nursing Profession In The 1990's: Negligence And Malpractice Liability,* 43 Clev. St. L.Rev. 557 (1995)(footnotes omitted), the authors note:

 Private entities can also establish and define the nursing standards of care. The Joint Commission on Accreditation of Healthcare Organizations (JCAHO), a private nongovernmental agency that establishes standards for the operation of hospitals, has promulgated A Guide to JCAHO Nursing Services Standards to govern nurses at JCAHO hospitals or facilities. These guidelines provide evidence of the appropriate standard of care even at facilities which are not accredited by JCAHO.

Nursing organizations such as the American Nurses Association (hereinafter ANA), and various specialty organizations such as the Emergency Nurses Association (hereinafter ENA), promulgate their own rules of conduct which serve as guidelines for acceptable nursing practice. The ANA's standards are generally applicable to nurses in all settings, whereas each of the ANA's divisions, such as medical-surgical, maternal-child, geriatrics, and mental health, have established their own distinct specialty standards. Nursing Codes of Ethics, such as those produced by the ANA, ENA, and individual hospitals, also contain standards of care which are applicable to nurses practicing in the profession.

tient positioning—is built into the nursing care standards for prevention of bedsores.[4] Although the nurse doubtless possesses skill, knowledge, experience and training related to her field (or speciality), the fundamental support provided for her expertise, which is revealed in the affidavit of record, is to be found in the nursing care standards.[5] The nurse did not independently establish a causal link between the appearance of bedsores and the malpositioning of the patient by drawing her own conclusion solely from her personal knowledge of the skin's reaction to external forces in action.

4. *See in this connection Smith v. Kris–Bal Realty, Inc.*, 242 N.J.Super. 346, 576 A.2d 934, 935 (1990) (the court held that an Occupational Safety and Health Act code, **when used in connection with expert testimony,** may be relied **upon to illustrate industry standards** and **to provide support for the opinion of an expert** on the proper standard of care under the teachings of *McComish v. DeSoi*, 42 N.J. 274, 200 A.2d 116, 120–21 (1964)).

5. While private standards promulgated by standards-making organizations have no official or legal status except to govern the conduct of the profession and industry, courts generally admit them unless a challenge is sustained. *The Anatomy of Private Standards–Making Process, supra* note 3, at 63–66.

6. *Fabianke v. Weaver By and Through Weaver*, 527 So.2d 1253, 1258 (Ala.1988) (routine prenatal, labor, and delivery treatment is an **area of overlapping expertise** of the family and OB/GYN medical specialties); *Sinkfield v. Oh*, 229 Ga. App. 883, 495 S.E.2d 94 (1997)(pharmacology and toxicology are **overlapping fields of science and medicine**); *Stubbs v. Ray*, 218 Ga.App. 420, 421, 461 S.E.2d 906 (1995) (a board-certified general surgeon **shared overlapping expertise** with defendant radiologist); *Steele v. Buxton* 93 Ohio App.3d 717, 639 N.E.2d 861 (1994) (a general practitioner serving as a surgical assistant was competent to testify because of **overlapping specialties**); *Marshall v. Yale Podiatry Group*, 5 Conn.App. 5, 496 A.2d 529, 531 (1985) ("where the evidence indicates that the specialties overlap and the applicable standard of care is common to each, a medical expert from either of the **overlapping groups** who is familiar with that common standard is competent to testify as to the standard of care")(emphasis added). In *Enslen v. Kennedy*, 26 Cal.Rptr.3d 274, 127 Cal. App.4th 1448, 1458 (2005) the court noted that the "state's jurisprudence of 'cross-over' expert testimony has been one long march toward allowing experts in one profession to testify as to the malpractice of practitioners in a related profession or discipline when there is **commonality or 'overlap'** … [in] the two professions and the malpractice claim implicates that commonality or overlap." (emphasis added). In *Sinkfield, supra*, a statement in concurrence noted that "[i]f an expert in the area of health sciences, which **overlaps** in another area of health sciences, can qualify as an expert witness to testify as to the standard of care exercised in the **area of overlapping treatment**, then it also follows that such expert can testify as to his or her opinion as to causation, etiology, even though the expert is not a holder of a medical degree." 495 S.E.2d at 99 (Eldridge, Judge, concurring)(emphasis added). *See also* Rosenberg by *Rosenberg v. Cahill*, 99 N.J. 318, 492 A.2d 371, 379 (1985)(a licensed medical doctor may be competent to express an opinion concerning the standard of care applicable to a chiropractor as to matters that each of these licensed disciplines shares in common in terms of education, training and licensure); *Alexander v. Mount Carmel Med. Ctr.*, 56 Ohio St.2d 155, 383 N.E.2d 564 (1978) (a podiatrist is competent to testify against an orthopedic surgeon on the issue of proper casting of a fracture); *Mitchell v. United States*, 141 F.3d 8, 15–16 (1st Cir. 1998) (an internist who had performed over 20,000 colonoscopies may testify to the standard of care expected of gastroenterologists in adjusting anticoagulant levels for patients undergoing colonoscopies); *Handson v. HCA Health Svcs. of Ga., Inc.*, 264 Ga. 293, 294, 443 S.E.2d 831 (1994) (an allopathic physician is competent to testify as to an osteopathic physician's care and skill); *Crook v. Funk*, 214 Ga.App. 213, 215, 447 S.E.2d 60 (1994) (a physician is competent to testify about competency of registered nurse); *Soteropulos v. Schmidt*, 556 So.2d 276, 280 (La.App.1990) (orthopedic surgeons were qualified to give their expert opinions regarding a vascular surgeon's adherence to standard of care in performing a below-knee amputation). *See* Expert Evidence: A Practitioner's Guide to Law, Science, and the FJC Manual (Bert Black, Patrick W. Lee, eds.)(1997)(App., Federal Judicial Center, Reference Manual on Scientific Evidence, *Evidentiary Framework*, at 55–67).

## C.

### Overlapping Expertise Drawn From Different Health Care Fields

¶ 5 Legally recognized expertise in a scientific subject need not be confined to a single academic discipline or a single learned profession. It may be found in **several areas** of learning or in several practising professions whose scientific insight overlaps with that of another field of knowledge.[6] If so, persons of **different occupations or academic areas of knowledge** may qualify as experts in the same subject. This is certainly true in this case.

¶ 6 Both physicians and registered nurses may qualify by education, training and experience to give expert testimony about the etiology of decubitus ulcers. **No scientific or academic field of knowledge can be said to be tightly compartmentalized within a single profession.**

### D.

#### *The Medical Expertise In The Etiology Of Decubitus Ulcers*

¶ 7 While health care experts consist of both medical and nursing professionals, the expertise required of the two fields is often very different. The nursing professional's expertise utilized in this case is centered on the positioning technique's role in avoiding development of decubitus ulcers. Although the nurse doubtless based the causation opinion in the evidentiary materials on her own experience, education and training,[7] **added strength must be accorded to her expert view on the etiology by her reliance upon the unchallenged professional standards in which the needed causal link is comprised.**

### II

### THE NISI PRIUS CHALLENGE TO THE NURSE'S QUALIFICATIONS

¶ 8 The trial court **rejected** *sua sponte* the nurse's qualification as an expert witness for causation testimony based solely on the credentials she submitted with the evidentiary materials in the record. Its challenge to the witness' expertise was interposed in the exercise of the trial court's judicial powers to dispose of summary process.[8] When considering summary relief nisi prius courts are empowered to resolve **all** legal issues necessary for the decision that will dispose of a summary judgment quest.[9]

¶ 9 To assist the trial court in analyzing the **nursing care standards** or a **nurse's qualifications** as an expert witness, briefs that accept or challenge the basis for one's expert status would have been most helpful. The parties offered here no assistance to the trial court in the resolution of the legal issues tendered by summary process. The defendants never challenged the **nurse's qualifications** to give expert causation testimony. Neither did they suggest that the **nursing standards,** relied on in the evidentiary materials, **were incorrectly applied or are flawed** because they fail to conform to the

---

7. *See, e.g., Mellies v. National Heritage, Inc., supra* note 1 at 222–23.

8. According to the trial court's summary judgment:

 The Court, after reading the briefs of the parties, hearing argument of counsel and being fully advised in the premises finds:
 1. That there is **no issue of material fact in dispute.**
 2. That plaintiff has not endorsed a competently trained medical professional who is experienced and licensed to make a medical diagnoses, by endorsing a nurse expert rather than a physician.
 3. That plaintiff, therefore, **has failed to produce any competent and admissible evidence regarding the element of causation.**
 (emphasis added).
 **The trial court's summary judgment is not responsive to the issues in the case.** (1) The focus in summary process is on whether the tendered proof by evidentiary materials in the record reveals only undisputed material facts **supporting but a single inference** that favors the movant's quest for relief. (2) The nonmovant is not held to the standard of producing forensic evidence. *Davis v. Leitner, 1989 OK 146,* ¶ 13, *782 P.2d 924,*

926 ("The [evidentiary] materials attached to a response to a motion for summary judgment are not to be held to the standard of competent, admissible evidence."). All that is required of the nonmovant is to "present something which shows that when the date of trial arrives, he will have some proof to support his allegations." *Id.* For an item of evidentiary material to be insufficient to defeat a motion for summary judgment, it must either facially lack probative value or be incapable of conversion at trial to admissible evidence. *Copeland v. Lodge Enterprises, Inc., 2000 OK 36,* ¶ 9, *4 P.3d 695,* 699; *Seitsinger v. Dockum Pontiac Inc., 1995 OK 29,* ¶ 16, *894 P.2d 1077,* 1081.

9. Although in the course of summary process trial judges **may consider** *sua sponte* and **decide** legal issues (*Travelers Ins. Co. v. L.V. French Truck Service, Inc., 1988 OK 76,* ¶ 13, *770 P.2d 551,* 557), the better practice for judges to employ when the **issue is one of first impression** is to call for and receive help through briefs. The trial judge in this case would have been aided by briefs since the issue whether the nurse's credentials qualified her as an expert witness for giving causal-link testimony is presently unsettled by Oklahoma jurisprudence.

currently accepted teachings of medicine.[10] The plaintiff also raised no challenge to the physician's expert opinion about decubitus ulcers' development.

¶ 10 The registered nurse's evidentiary materials did not facially disqualify her from giving an expert opinion on the etiology of the plaintiff's ulcers. Her expertise is partly rested on full support from the unchallenged standards that comprise the medical view of decubitus ulcers' etiology. Had any party challenged at nisi prius either the experts' qualifications or the utilized nursing standards **and** offered additional materials of their own (by acceptable probative substitutes), the outcome of today's legal analysis might have been different.

## III

## SUMMARY

¶ 11 The etiology of decubitus ulcers may lie within the professional expertise of a registered nurse as well as of a physician. Members of both professions could hence qualify by education, professional practice and experience to give expert testimony on that subject.

¶ 12 **No profession will be permitted to monopolize the expertise in any field of scientific knowledge if another is shown to possess like or equal insight into the matter that lies under judicial inquiry.**[11]

¶ 13 There was here neither a challenge to the registered nurse's qualifications nor to the professional standards she invoked. The materials submitted in summary process did not facially disqualify her as an expert. She

was amply supported by the unchallenged standards of her profession.

¶ 14 Because the etiological link between the nurses' malpositioning of plaintiff and his development of decubitus ulcers stands in dispute by submission of two expert opinions that contradict one another, both tendered by acceptable evidentiary substitutes, I concur in today's reversal.

WINCHESTER, V.C.J., with whom TAYLOR, J. and JOHNSON, S.J., join, dissenting:

¶ 1 I agree with the majority that a nurse may qualify to testify as an expert on the issue of the standard of care practiced by other nurses. I dissent because there is a significant difference between allowing a nurse expert to testify as to the standard of care of other nurses and allowing a nurse expert to testify as to *causation* in malpractice cases. Today's majority announcement expands the role of nurses beyond that which the Legislature has been willing to confer, is unsupported by precedent and is contrary to extant jurisprudence.

¶ 2 Three elements are essential for actionable negligence: (1) a duty owed by the defendant to protect the plaintiff from injury, (2) a failure of the defendant to properly exercise or perform that duty, and (3) an injury to the plaintiff directly caused by the defendant's failure. *Thompson v. Presbyterian Hospital,* 1982 OK 87, ¶ 7, 652 P.2d 260, 263; *Nicholson v. Tacker,* 1973 OK 75, ¶ 9, 512 P.2d 156, 158; *Rush v. Mullins,* 1962 OK 62, ¶¶ 5, 6, 370 P.2d 557, 559. In all but extraordinary cases, medical negligence must be established through expert medical testi-

10. If the invoked nursing standards are in conflict with other professional standards on the subject or are incorrectly rendered by the nurse's affidavit, they can be challenged in both summary and trial process. **Because the nursing care standards noted in the nurse's affidavit were not challenged at nisi prius, the court must accept them here without question.** See generally matters of health care upon which a qualified nurse may give helpful expert testimony. Robert C. Clifford, QUALIFYING AND ATTACKING EXPERT WITNESSES §532, at 5-52 (rev. 18, 2005)(1988).

11. If one party's expert witness' highest university degree attained is of a lower rung in the academic hierarchy than that of another party's

expert, but their level of gained knowledge in the field, by learning or experience, is sufficient to qualify both as forensic experts, their standing is the same. Neither is to be deemed superior to the other. **Both stand on equal footing.** It is the trier of fact who must then decide which of their divergent opinions is to be believed and which is to be rejected as unworthy of acceptance. This is the quintessence of the common-law system's technique for ascertaining the truth in the conduct of a trial. *Giles v. Rhodes,* 171 F.Supp.2d 220, 227 (S.D.N.Y.,2001) ("That reality reflects the jury's traditional power to accept or reject the testimony of any witness, lay or expert.").

mony. *Johnson v. Hillcrest Health Center, Inc., 2003 OK 16, ¶ 13, 70 P.3d 811,* 817; *Turney v. Anspaugh, 1978 OK 101, ¶ 20, 581 P.2d 1301.*

¶ 3 It is undisputed Nurse Fuller opines as to causation when she asserts that Gaines developed the ulcers as a direct result of the failure of the nurses who were caring for him to meet the requisite standard of care. She further asserts that the development of the decubitus ulcers was preventable if the standard of care had been met, despite the patient's size, nutritional deficits, and or immobility due to the trauma and surgical complications.[1] The specific issue on appeal is whether Nurse Fuller, a registered nurse, qualifies as an expert to testify *concerning the cause* of the decubitus ulcers suffered by Gaines.

¶ 4 The Oklahoma Legislature has distinctly delineated the roles of physicians and nurses. Physicians are expressly authorized to diagnose and treat diseases, illnesses and injuries. *59 O.S.2001, 492* (C)(3)(a). In contrast, nurses are not authorized to make any type of medical diagnosis. Rather, nurses perform services "for purposes of *nursing* diagnosis and treatment of human responses to actual or potential health problems consistent with educational preparation." Title *59 O.S.2001, 567.3a* (2) (emphasis added). While each are educated and licensed in their respective fields, physicians diagnose and treat diseases, illnesses and injuries whereas nurses execute the orders of the physicians. Unlike physicians, the Legislature has not provided for nurses to medically diagnose the cause of any medical condition. Nurse Fuller purports to do what the statutes authorize physicians to do, that is, diagnose the cause of a disease. Her affidavit claims that Gaines's ulcers were caused by the negligence of his nurses and she rules out any other cause. Allowing nurses to offer testimony on causation is equivalent to allowing them to diagnose disease, an act the Legislature has clearly reserved for physicians. *See 59 O.S.2001, 492* (C)(3)(a).

¶ 5 Likewise, this Court has consistently held that physicians, not nurses, are qualified to diagnose diseases and, consequently, testify as to causation. *See Shawnee Gas & Electric Co. v. Hunt, 1912 OK 276, ¶ 3, 122 P. 673,* 674. In *Shawnee Gas & Electric Co.,* the mother of the plaintiff was a graduate nurse, who testified during the trial that her son was suffering from an epileptic condition, based on her opinion. The Court observed that she had never nursed in cases of epilepsy, and that her testimony as an expert as to what these symptoms indicated was not admissible because there was no proof in the case showing that nurses, as part of their training, were required to learn to diagnose diseases. *Id.* While Nurse Fuller, in the case now before this Court, may recognize decubitus ulcers, there is nothing in the affidavit or the statutes to show that registered nurses are trained in diagnosing the cause of diseases.

¶ 6 The majority goes to great lengths to show that several jurisdictions allow nurses to testify as experts in decubitus ulcer malpractice cases and that Oklahoma would be a "minority of one" if it did not allow such testimony.[2] However, the majority fails to distinguish between allowing expert testimony on the standard of care of other nurses and allowing it on the issue of medical causation. This distinction is critical as only two of the nine cases relied on by the majority, all of which are *intermediate* appellate decisions, actually allowed a nurse expert to testify as to causation. The remaining seven cases, while allowing nurse expert testimony for standard of care purposes, either didn't address the issue of causation or rejected such testimony outright. In fact, in Bermisa, the majority opinion's only mention of nurses and expert testimony stated that it was error

---

1. Affidavit of Susan Fuller, R.N., page 2. Contrary to Nurse Fuller's assertions, Dr. Means testified that, after repairing two abdominal eviscerations, he instructed nurses not to turn Gaines but to keep "him in bed for a few days flat because I was worried about his guts falling out again." He further testified in his deposition that Gaines developed the ulcers because of his size and the amount of trauma he sustained.

Finally, Dr. Means testified that he had no criticism of the care the nurses provided the patient and concluded that the ulcers were not preventable.

2. *See* ¶ 12 and accompanying footnotes of the majority opinion.

(albeit harmless error) for the nurses' testimony, *offered as lay opinion,* to stray into the more "'scientific, technical, or other specialized knowledge' such that expert testimony would have been required." *State v. Bermisa,* 104 Hawai'i 387, 90 P.3d 1256, 1266 (Haw.App.2004). It is unclear how this supposition does anything to bolster the majority's position.

¶ 7 Despite the majority's suggestion of a growing trend otherwise, the majority of jurisdictions facing the issue refuse to allow nurse expert testimony on the issue of causation. In *Richardson v. Methodist Hospital of Hattiesburg* 99–CA–02001–SCT, 807 So.2d 1244 (Miss.2002), the plaintiff brought a personal injury and wrongful death lawsuit against the hospital. The trial court granted the hospital's motion for summary judgment. The plaintiff had offered as her expert, Crystal D. Keller, a Registered Nurse and Certified Legal Nurse Consultant, who was designated to testify to the appropriate nursing standards of care and deviations from those standards committed by the hospital staff. In addition, the nurse's report stated that the deviations from the requisite standard of nursing care led to Wheeless's suffering and subsequent death. *Richardson,* 99–CA–02001–SCT (¶ 4), 807 So.2d at 1245.

¶ 8 The Supreme Court of Mississippi held that the nurse was qualified to testify concerning deviations in nursing care and resultant pain and suffering, but she was not qualified to testify concerning the causal nexus between those deviations and the patient's death. *Richardson,* 99–CA–02001–SCT (¶ 14), 807 So.2d at 1247–1248. In affirming the trial court in part, the Supreme Court observed that the plaintiff's expert had failed to make the required showing that the negligent care by defendant's nurses had caused or contributed to the patient's death. *Richardson,* 99–CA–02001–SCT (¶ 16), 807 So.2d at 1248. The court only allowed the testimony to prove the patient's suffering.[3]

¶ 9 The majority opinion blurs the line between standard of care and causation. Although the majority attempts to limit its holding to decubitus ulcer cases, its weak boundaries will soon be eroded entirely, and the door will be opened for a wide variety of medical providers (not just nurses) to render expert opinions as to causation in malpractice cases despite the fact they do not have the requisite training, education or experience to make medical diagnoses. While nurses and other medical care providers provide an invaluable service to patients as well as physicians, the Legislature has placed the responsibility for disease diagnosis squarely on physicians. The majority's pronouncement impermissibly extends the legislatively-defined role of nurses and fails to value the more intensive training and education required of physicians.

¶ 10 In the case now before us, Nurse Fuller may be competent to testify concerning the standard of care for nurses, and whether the standard was breached, but not whether the breach was the direct cause of Gaines's ulcers. The trial court correctly determined the plaintiff's proposed nurse expert was unqualified to testify as to the causation of the plaintiff's decubitus ulcers. Because the trial court has wide discretion in ruling on the admissibility of expert testimony, unless that discretion has been abused, the trial court's decision should not be disturbed. *Johnson v. Wade, 1982 OK 32,* ¶ 20, *642 P.2d 255,* 261. Here, the trial court did not abuse its discretion in finding that Nurse Fuller was not competent to testify as an expert witness concerning the cause of the plaintiff's decubitus ulcers. I would affirm the trial court and, thus, respectfully dissent.

---

3. *See also, e.g., Long v. Methodist Hospital of Indiana, Inc.,* 699 N.E.2d 1164, 1169 (Ind.Ct.App.1998)("the determination of the medical cause of injuries, which is obtained through diagnosis, for purposes of offering expert testimony is beyond the scope of nurses' professional expertise."); *Elswick v. Nichols,* 144 F.Supp.2d 758, 765 (E.D.Ky.2001)(nurse not qualified to give opinion on causation because it is equivalent of medical diagnosis); *Sandell v. Hooter,* 692 So.2d 474 (La.App. 3.1997)(same); *Flanagan v. Labe,* 547 Pa. 254, 690 A.2d 183, 185 (1997)(only physicians can testify to causation); *Colwell v. Holy Family Hosp.,* 104 Wash.App. 606, 15 P.3d 210, 213–214 (Div. 3 2001)(nurse not allowed to testify as to causation of death blamed on nursing negligence).